Mrs. Margaret M. LARCHE et al., in Their Individual Capacities and as Registrars of Voters in and for Their Parishes of the State of Louisiana,

v.

John A. HANNAH et al., Individually and as Members of the Commission on Civil Rights.

Civ. A. No. 7479.

United States District Court
W. D. Louisiana,
Shreveport Division.

Oct. 7, 1959.

Wisdom, Circuit Judge, dissented in part.

Jack P. F. Gremillion, Atty. Gen. of Louisiana, George M. Ponder, First Asst. Atty. Gen. of Louisiana, William M. Shaw, Ferdinand A. Cashio, Asst. Attys. Gen. of Louisiana, M. E. Culligan, New Orleans, La., John E. Jackson, Jr., William P. Schuler, New Orleans, La., N. Cleburn Dalton, Baton Rouge, La., W. Scott Wilkinson, Shreveport, La., Albin P. Lassiter, Monroe, La., Frank J. Looney, Sr., Shreveport, La., L. H. Padgett, Jr., Bossier City, La., Fred Jackson, Homer, La., Thompson L. Clarke, St. Joseph, La., Cameron C. Minard, Columbia, La., H. Lester Hughes, Natchitoches, La., Richard H. Kilbourne, Clinton, La., France Watts, Jr., Franklinton, La., J. Reuel Boone, Many, La., for plaintiffs.

Robert G. Storey, Vice-Chairman, Commission on Civil Rights, Dallas, Tex., C. E. Clark, Washington, D. C., Legal Asst. to Robert G. Storey, W. Wilson White, Asst. Atty. Gen., T. Fitzhugh Wilson, U. S. Atty., Shreveport, La., Gordon M. Tiffany, Director, Berl I. Bernhard, A. William Mottolese, Attys., Commission on Civil Rights, Washington, D. C., for defendants.

Bruce Bennett, Atty. Gen. of Arkansas, amicus curiae.

Before WISDOM, Circuit Judge, BEN C. DAWKINS, Jr., Chief Judge, and HUNTER, District Judge.

HUNTER, District Judge.

This case originated in the Shreveport Division of the Western District of Louisiana upon the filing of a complaint on July 10, 1959. Plaintiffs are registrars of voters in and for certain parishes in Louisiana [1]. The Commission on Civil Rights is a temporary agency of the United States, created by the Civil Rights Act of 1957, under Public Law 85–315, 85th Congress, 42 U.S.C.A. § 1975 et seq. The Commission scheduled a hearing for July 13, 1959, in Shreveport, Louisiana for the purpose of investigating allegations in writing (under oath or affirmation) that certain citizens were being deprived of their right to vote on account of race or color [2]. These allegations accuse the registrars, through their official acts, of having caused such deprivation, and summoned them to appear before the Commission. The subpoenas also required the registrars to produce for inspection various voting and registration records within their custody and control.

The suit is against the Commission and its members. Its declared object is to stay the effectiveness of the Commission subpoenas and subpoenas duces tecum, and to restrain and enjoin the conduct of the proposed hearing. The registrars insist they are entitled to this relief because the Commission is seeking to hold such hearing pursuant to rules of procedure which are ultra vires, and which deny to them traditional procedural safeguards. Moreover, the registrars assert that the rules of procedure

---

1. Hereinafter referred to as "Registrars".

2. Under Section 104(a) of that Act the Commission is empowered and directed to: "(1) investigate allegations in writing under oath or affirmation that certain citizens of the United States are being deprived of their right to vote and have that vote counted by reason of their color, race, religion, or national origin; which writing, under oath or affirma-

tion, shall set forth the facts upon which such belief or beliefs are based; * * *"

The Act also empowers the Commission, or any authorized subcommittee thereof, to hold such public hearings and act at such times and places as the Commission may deem advisable. Said Act also empowers the Commission to require the attendance and testimony of witnesses or the production of written or other matters.

adopted by the Commission violate their fundamental constitutional rights; and that the Act in its entirety is unconstitutional because it constitutes an unconstitutional delegation of power [3].

Detailing their complaints, supported by sworn affidavits, the registrars allege that they were served with subpoenas and subpoenas duces tecum issued by the Chairman of the Commission, commanding them to appear and testify before the Commission on July 13, 1959; that they have not been informed of the nature of the complaints against them, nor have they been assured that they will be confronted with the complaining witnesses; that the Commission repeatedly has informed the Attorney General of Louisiana that it would not, under any circumstances, furnish plaintiffs with, or permit them to examine, the written complaints filed against them, nor would it divulge the name or names of the secret complainants; that the rules under which the hearing is to be conducted specifically deny to registrars the right to cross-examine their accusers [4].

On July 10, 1959 the case was heard by the Honorable Ben C. Dawkins, Jr., Chief Judge of the Western District of Louisiana. 176 F.Supp. 791. The matter was extensively argued and briefed. On July 12th Judge Dawkins granted a temporary restraining order and issued a rule on the Commission and its members to show cause why an interlocutory injunction should not issue. Judge Dawkins, in issuing the temporary restraining order, did not intimate any opinion as to the constitutionality of the statute itself [5]. This three-judge court was convened to consider the constitutional attack.

■ The principal object and purpose of a three-judge federal court is to decide the constitutional validity of the Act of Congress sought to be enjoined. But where other issues are presented, as they are here, they too should be decided. The parties readily agree that this is so and that all issues, both constitutional and non-constitutional, are before this court [6].

### The Constitutionality of the Act Itself

Complainants seek a declaratory judgment to the effect that the Act is unconstitutional because it is not appropriate legislation. Manifestly, this position cannot be sustained.

■ The Constitution and pertinent decisions of the Supreme Court make clear that Congress may, pursuant to power conferred upon it by Article 1 of the Constitution, legislate to secure the right to vote in federal elections. That power has been found in Article 1, Section 4. Ex parte Siebold, 1879, 100 U. S. 371, 383, 25 L.Ed. 717; Ex parte Yarbrough, 1884, 110 U.S. 651, 660, 4 S.Ct. 152, 28 L.Ed. 274; United States v. Mosley, 1915, 238 U.S. 383, 35 S.Ct. 904, 59 L.Ed. 1355. It has been found in Article 1, Section 8, Clause 18, Ex parte Yarbrough, supra, 110 U.S. at page 658, 4 S.Ct. at page 155. It has been found in Article 1, Section 2, United States v. Classic, 1941, 313 U.S. 299, 316, 61 S.Ct. 1031, 85 L.Ed. 1368. And, as the Supreme Court noted in the Classic case,

---

3. Registrars also contend that the procedural provisions of the Administrative Procedure Act should be applied. We cannot agree. The A.P.A. prescribes in section 7 (5 U.S.C.A. § 1006) specific hearing procedures with respect to two processes; in section 4 (5 U.S.C.A. § 1003) with respect to "rule making", and in section 5 (5 U.S.C.A. § 1004) with respect to "adjudications." The Act contains no hearing requirements except where rule making or adjudications are involved. The Civil Rights Commission is performing neither function here.

4. The truth of these facts is not contested.

5. Judge Dawkins' opinion is made a part hereof by reference.

6. California Water Service Co. v. City of Redding, 1938, 304 U.S. 252, 58 S.Ct. 865, 82 L.Ed. 1323; Davis v. Wallace, 1922, 257 U.S. 478, 482, 42 S.Ct. 164, 66 L.Ed. 325; Louisville & Nashville R. Co. v. Garrett, 1913, 231 U.S. 298, 304, 34 S.Ct. 48, 58 L.Ed. 229.

supra, 313 U.S. at page 315, 61 S.Ct. at page 1038:

"* * * since the constitutional command is without restriction or limitation, the right unlike those guaranteed by the Fourteenth and Fifteenth Amendments, is secured against the action of individuals as well as of states."

▌ It is equally clear that Congress may, pursuant to Section 2 of the 15th Amendment, legislate to prevent states and their officials from denying qualified persons the right to vote on account of race, color, or previous condition of servitude (Guinn v. United States, 1915, 238 U.S. 347, 35 S.Ct. 926, 59 L.Ed. 1340; In re Wallace, D.C. 1959, 170 F. Supp. 63). Similarly, Congress may, pursuant to Section 5 of the 14th Amendment, legislate to prevent states and their

officials from enacting or enforcing statutes which deny equal protection of the laws.

▌ Since Congress may legislate pursuant to its constitutional powers, and since it may investigate those objects upon which it may legislate [7], and since it may delegate its investigative function [8], the issue of the constitutionality of the acts in creating the Commission rests solely on the question of whether the action of Congress was, in fact, an implementation of its constitutional powers. The stated purposes of the act, its fair reading, and its overwhelming legislative history are proof positive that Congress did create the Commission pursuant to its Article 1 power, as well as to its powers under Sections 5 and 2 of the 14th and 15th Amendments [9], respectively.

7. Watkins v. United States, 1957, 354 U.S. 178, 77 S.Ct. 1173, 1 L.Ed.2d 1273.

8. Endicott Johnson Corp. v. Perkins, 1943, 317 U.S. 501–510, 63 S.Ct. 339, 87 L.Ed. 424.

9. (A). From the report of the House of Representatives Judiciary Committee (Report No. 291, 85th Congress, First Session, U.S.Code Congressional and Administrative News 1957, p. 1966) accompanying the bill which became, in pertinent part, the Civil Rights Act of 1957, it is manifest that Congress was legislating pursuant to its Article 1 power. Thus, that portion of the report designated "General Statement" notes:

"The provisions of the bill H.R. 6127 are designed to achieve a more effective enforcement of the rights already guaranteed by the Constitution and laws of the United States. This is particularly true with regard to the right of franchise in Federal matters." (At page 5.)

Similarly, the "General Statement" portion continues at page 6:

"With regard to the proposals involving the right to vote, the Federal Government has placed upon it by article 1, section 4, of the Constitution the authority to regulate the manner of conducting elections and that authority is further suppemented by the 14th and 15th amendments."

There is further evidence that throughout its deliberations Congress was conscious of its Article 1 power. A clear exercise of that power is illustrated by

the enactment of the present subsection (b) of section 1971, Title 42. In authorizing the federal government to prevent certain types of conduct by individuals, its terms are carefully limited to federal elections. And, as the House Report, supra, makes clear (at pages 11–13), Congress rooted this provision in its Article 1 power.

Finally, the history of the terms of the Act which prescribe the duties of the Commission reveals that it was created pursuant to the Article 1 power. Section 104(a) directs that the Committee shall:

"(1) investigate allegations in writing under oath or affirmation that certain citizens of the United States are being deprived of their right to vote and have that vote counted * * *" (Emphasis supplied.)

The italicized language was inserted by the House after the bill came out of Committee, Representative Hoffman, favoring the amendment, regarded its inclusion as crucial since Supreme Court had held it to be an integral part of the right to vote in United States v. Classic, supra (103 Cong.Rec.App. 4716). Thus, the Commission was directed to investigate deprivations of an aspect of the right to vote which had been enunciated in a case which involved the Article 1 power of Congress.

(B). *The 14th Amendment.* In the House debates Congressman Celler referred to the Act (103 Cong.Rec. 16088) as "* * * clear implementation of

■■ We are mindful of the arguments repeatedly appearing in the registrars' brief to the effect that the power granted to Congress to legislate is specifically limited by the Tenth Amendment. On its face the Tenth Amendment recognizes that certain powers are prohibited by the Constitution to the states, and therefore are not reserved to the states. One of these prohibitions is that no state may deny equal protection of its laws (14th Amendment). Another is that no state may deny the right to vote on account of race, color, or previous condition of servitude (15th Amendment). Still another provision of the Constitution specifically gives to Congress the power to legislate to secure the right of qualified electors to vote

in federal elections (Article 1, Sec. 2). So, we have here involved the very powers which the Constitution says are not reserved to the states. The action here is not an invasion of state power merely because state voting and registration records are involved. The congressional power is complete in itself and may be exercised to its full extent. The investigation of alleged discriminatory practices is an appropriate step in the process of enforcing and protecting the right of qualified electors [10] to vote. The Act very definitely constitutes appropriate legislation.

### The Rules of the Commission

The remaining pertinent and serious questions presented may be thus stated:

the 14th and 15th amendments." Similarly, in the words of the House Report, supra, at page 6:
" * * * the 14th amendment operates to prevent any State from enacting or enforcing a law which would abridge the privilege and immunity of a United States citizen and denying such a person the equal protection of the laws. *These two amendments expressly authorize Congress to enforce them by legislation.*" (Emphasis supplied.)
" * * * the 14th and 15th amendments, both of which expressly confer upon the Congress the power to enforce them by appropriate regulations." (At page 13.)
Above all, the terms of the Act itself which relate to the Commission on Civil Rights demonstrate conclusively that Congress relied in part upon its powers under section 5 of the Fourteenth Amendment. By section 104(a) the Commission is directed to:
"(2) study and collect information concerning legal developments constituting *a denial of equal protection of the laws under the Constitution;* and (emphasis supplied)
"(3) appraise the laws and policies of the Federal Government *with respect to equal protection of the laws* under the Constitution." (Emphasis supplied.)
The inclusion by Congress of the italicized language manifests its reliance upon a concept found only in the 14th Amendment.
(C) *The 15th Amendment.* For example, the statement of Senator Bush

at 103 Congressional Record, 13138: "That is the central purpose of this bill: to give meaning to the 15th amendment of the Constitution of the United States." See also the statement of Representative Celler in the House debates at 103 Congressional Record 16088.

10. Under our constitutional system the qualification of voters is a matter committed to the states, subject to federal constitutional restraints prohibiting discrimination on account of race, color, sex, etc. But it is also true that the right of citizens to cast ballots, and have them counted in congressional elections, *in accordance with applicable state laws,* is a right secured by the federal constitution, and this right, unlike those carried by the 14th and 15th amendments, is secured against the actions of individuals as well as states. Article 1, Section 2 of the Constitution, in its provisions for the election of members of the House of Representatives, and the Seventeenth Amendment, in its provision for the election of Senators, provide that officials will be chosen "by the people". Each provision goes on to state that "the electors in each State shall have the qualifications requisite for electors of the most numerous branch of the State Legislature." So, while the right of suffrage in federal elections is established in the Constitution, it is subject to the imposition of state standards which are not discriminatory (Lassiter v. Northampton County Board of Elections, 360 U.S. 45, 79 S.Ct. 985, 3 L.Ed.2d 1072, decided June 8, 1959.

(1) Did Congress, in creating the Commission, specifically authorize it to adopt rules for investigations conducted under Section 104(a) (1) of the Act which would deprive parties investigated of their rights of confrontation and cross-examination and their right to be apprised of the charges against them? [11]

(2) If Congress did so authorize the Commission is such authorization constitutionally permissible?

A careful reading of the several opinions in Groban [12], Anonymous [13], and Greene [14] convinces us that, as applied to the circumstances of this case, a serious constitutional issue is presented as to whether or not the rules adopted by this Commission, which deprived these plaintiffs of the right of confrontation and cross-examination and the right to be apprised of the complaints against them, are violative of the Constitution. There is no talismanic formula which can be applied. Every term, the Supreme Court examines the particular circumstances of particular cases in order to apply generalities which no one disputes.

Under the rationale of Greene, concurred in by eight justices, a decision is not now required on the constitutionality of these deprivations. It is sufficient that we find nothing in the Act which expressly authorizes or permits the Commission's refusal to inform persons, under investigation for criminal conduct, of the nature, cause and source of the accusations against them, and there is nothing in the Act authorizing the Commission to deprive these persons of the right of confrontation and cross-examination.

Here, plaintiffs are being subjected to public opprobrium and scorn without fair and adequate opportunity to disprove the accusations against them. They are being subjected to the distinct likelihood of losing their jobs. They have been charged with, and are under investigation for, criminal conduct, and are to be examined in connection with offenses constituting federal and state crimes [15] in a hearing which would com-

---

11. Congress authorized the Commission to hold hearings (42 U.S.C.A. § 1975d (f)). Congress enumerated specific mandates with respect to certain less fundamental procedural aspects (42 U.S.C.A. § 1975a). Congress did not expressly authorize the Commission to deny to parties investigated the right of apprisal, confrontation, and cross-examination. The Commission assumed that they had the power to so do.

On their own, they adopted a rule denying to the parties investigated the right of cross-examination. The rule is 3(i) and reads as follows:

"Interrogation of witnesses at hearings shall be conducted only by members of the Commission or by authorized staff personnel."

When informed that a hearing would be held to investigate charges against them, the registrars requested the right to see the accusations and affidavits filed against them. They also specifically requested the names of their accusers. The Commission refused both requests. The denial in each instance was by resolution (see Stipulation).

12. In re Groban, 352 U.S. 330, 77 S.Ct. 510, 1 L.Ed.2d 376, decided February 25, 1957.

13. Anonymous Nos. 6 and 7 v. Baker, 360 U.S. 287, 79 S.Ct. 1157, 3 L.Ed.2d 1234, June 15, 1959.

14. Greene v. McElroy, 360 U.S. 474, 79 S.Ct. 1400, 3 L.Ed.2d 1377, decided June 29, 1959.

15. The Commission admittedly plans to hold the hearing to investigate written allegations that the registrars deprived certain citizens of their right to vote because of their color, race, religion, or national origin (see Affidavits of Registrars and Stipulation No. 5). Acccordingly, it must be admitted that the registrars are being examined in connection with their alleged commission of federal and state crimes, as follows, to wit:
*18 U.S.C.A. § 242*
*"Deprivation of rights under color of law*
"Whoever, under color of any law, statute, ordinance, regulation, or custom, willfully subjects any inhabitant of any State, Territory, or District to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States, or to different punishments, pains, or penalties, on account of such inhabitant being an alien, or by reason of his color,

pletely fail to comport with traditional American ideas of fair play and would violate every element of natural justice.

The hearing sought to be restrained herein has been called pursuant to, and would be conducted in accordance with, rules which deny the right of confrontation. The registrars would be denied the right of cross-examination. They would be denied the right to be apprised of the identity of the person, or persons, making the charges against them, as well as the exact nature of the charge. These denials are the products of administrative decision not explicitly authorized by Congress. When we consider that this executive commission has been granted the right of subpoena to investigate allegations which, if true, would constitute the commission of crimes under state and federal law, and that it is further required to make a report of its findings to the Chief Executive whose duty it is to enforce federal criminal laws [16], we can reach no other conclusion than to say that if ever the traditional procedural safeguards, spoken of in Greene, were required to protect appearers before a commission, then this is the instance. There, the Supreme Court, speaking through its Chief Justice, said [360 U.S. 474, 79 S.Ct. 1413]:

"Certain principles have remained relatively immutable in our jurisprudence. *One of these is that where governmental action seriously injures an individual, and the reasonableness of the action depends on*

*fact findings, the evidence used to prove the Government's case must be disclosed to the individual so that he has an opportunity to show that it is untrue.* While this is important in the case of documentary evidence, it is even more important where the evidence consists of the testimony of individuals whose memory might be faulty or who, in fact, might be perjurers or persons motivated by malice, vindictiveness, intolerance, prejudice, or jealousy. We have formalized these protections in the requirements of confrontation and cross-examination. They have ancient roots. They find expression in the Sixth Amendment which provides that in all criminal cases the accused shall enjoy the right 'to be confronted with the witnesses against him.' This Court has been zealous to protect these rights from erosion. It has spoken out not only in criminal cases, e. g., Mattox v. United States, 156 U.S. 237, 242–244, 15 S.Ct. 337, 339–340, 39 L.Ed. 409; Kirby v. United States, 174 U.S. 47, 19 S.Ct. 574, 43 L.Ed. 890; Motes v. United States, 178 U.S. 458, 474, 20 S.Ct. 993, 999, 44 L.Ed. 1150; In re Oliver, 333 U.S. 257, 273, 68 S.Ct. 499, 507, 92 L.Ed. 682, but also in all types of cases where administrative and regulatory action were under scrutiny. E. g., Southern R. Co. v. Commonwealth of Virginia, 290 U.S. 190, 54 S.Ct. 148, 78 L.Ed. 260; Ohio Bell Telephone Co. v.

---

or race, than are prescribed for the punishment of citizens, shall be fined not more than $1,000 or imprisoned not more than one year, or both."
LSA–R.S. 14:134
"*Malfeasance in office*
"Malfeasance in office is committed when any public officer or public employee shall:
"(1) Intentionally refuse or fail to perform any duty lawfully required of him, as such officer or employee; or
"(2) Intentionally perform any such duty in an unlawful manner; or
"(3) Knowingly permit any other public officer or public employee, under his authority, to intentionally refuse or fail

to perform any duty lawfully required of him, or to perform any such duty in an unlawful manner.
"Whoever commits the crime of malfeasance in office shall be fined not more than five hundred dollars, or imprisoned for not more than six months, or both."

16. 42 U.S.C.A. § 1975c(b) requires the Commission to submit to the President a final and comprehensive report of its findings. Since the Commission is required to make this report to the President, the Chief Executive Officer of the land, it is fair to presume that a prime purpose of this report is to secure execution and enforcement of the laws presently in effect.

824

Public Utilities Commission, 301 U. S. 292, 57 S.Ct. 724, 81 L.Ed. 1093; Morgan v. United States, 304 U.S. 1, 19, 58 S.Ct. 773, 776, 999, 82 L.Ed. 1129; Carter v. Kubler, 320 U.S. 243, 64 S.Ct. 1, 88 L.Ed. 26; Reilly v. Pinkus, 338 U.S. 269, 70 S.Ct. 110, 94 L.Ed. 63. Nor, as it has been pointed out, has Congress ignored these fundamental requirements in enacting regulatory legislation. Joint Anti-Fascist Refugee Committee v. McGrath, 341 U.S. 123, 168–169, 71 S.Ct. 624, 646–647, 95 L. Ed. 817. (Italics ours.)

\* \* \* \* \* \*

"Where administrative action has raised serious constitutional problems, the Court has assumed that Congress or the President intended to afford those affected by the action the traditional safeguards of due process. See, e. g., The Japanese Immigrant Case [Kaoru Yamataya v. Fisher] 189 U.S. 86, 101, 23 S.Ct. 611, 614, 47 L.Ed. 721; Dismuke v. United States, 297 U.S. 167, 172, 56 S.Ct. 400, 80 L.Ed. 561; Ex parte Endo, 323 U.S. 283, 299–300, 65 S.Ct. 208, 217, 89 L.Ed. 243; American Power & Light Co. v. Securities and Exchange Commission, 329 U.S. 90, 107–108, 67 S.Ct. 133, 143, 91 L.Ed. 103; Hannegan v. Esquire, 327 U.S. 146, 156, 66 S.Ct. 456, 461, 90 L.Ed. 586; Wong Yang Sung v. McGrath, 339 U.S. 33, 49, 70 S.Ct. 445, 94 L.Ed. 616; Cf. Anniston Mfg. Co. v. Davis, 301 U.S. 337, 57 S.Ct. 816, 81 L.Ed. 1143; United States v. Rumely, 345 U.S. 41, 73 S.Ct. 543, 97 L.Ed. 770. These cases reflect the Court's concern that traditional forms of fair procedure not be restricted by implication and without the most explicit action by the Nation's lawmakers, even in areas where it is possible that the Constitution presents no inhibition."

And Mr. Justice Douglas, concurring in Peters v. Hobby, 349 U.S. 331, 75 S. Ct. 790, 800, 99 L.Ed. 1129, says:

"It, therefore, becomes necessary for me to reach the constitutional issue.

"Dr. Peters was condemned by faceless informers, some of whom were not known even to the Board that condemned him. Some of these informers were not even under oath. None of them had to submit to cross-examination. None had to face Dr. Peters. So far as we or the Board know, they may be psychopaths or venal people, like Titus Oates, who revel in being informers. They may bear old grudges. Under *Corss*-examination their stories might disappear like bubbles. Their whispered confidences might turn out to be yarns conceived by twisted minds, or by people who, though sincere, have poor facilities of observation and memory.

"Confrontation and cross-examination under oath are essential, if the American ideal of due process is to remain a vital force in our public life. We deal here with the reputation of men and their right to work —things more precious than property itself. We have here a system where government with all its power and authority condemns a man to a suspect class and the outer darkness, without the rudiments of a fair trial. The practice of using faceless informers has apparently spread through a vast domain. It is used not only to get rid of employees in the Government, but also employees who work for private firms having contracts with the Government. \* \* \*."

■ The Supreme Court, in Greene, clearly and concisely charted a salutary and sensible course to be followed. Whether the procedures under the circumstances here are constitutionally permissible we do not decide. In accordance with the teachings of Greene, we decide only that in a hearing such as the one envisaged here, the Commission had no right to deny the accused Registrars the traditional rights of confronta-

tion and cross-examination in the absence of explicit congressional authorization to do so.

In Greene the Supreme Court held these safeguards were not to be denied to one being investigated for alleged communistic associations and sympathies in the absence of explicit authorization from either the President or Congress. Surely, duly chosen state officials are entitled to the same protection, especially since no considerations of national security are involved. So is every citizen. In Greene, the government did not take the petitioner's job away from him, but he did lose his job as a result of a government finding to the effect that he was not a good security risk. If the Commission here finds the charges against the registrars are true, they are faced not only with public scorn and possible loss of their jobs, but also with probable indictment, arrest and prosecution.

■ We are impressed, but not persuaded, by the government's argument that the legislative history of the Act proves that the Commission acted at the implied direction of Congress in adopting the rules here under attack. This argument of implied direction cannot be sustained in the face of the following language from Greene:

> "The issue, as we see it, is whether the Department of Defense has been authorized to create an industrial security clearance program under which affected persons may lose their jobs and may be restrained in following their chosen professions on the basis of fact determinations concerning their fitness for clearance made in proceedings in which they are denied the traditional procedural safeguards of confrontation and cross-examination."

> "If acquiescence or implied ratification were enough to show delegation of authority to take actions within the area of questionable constitutionality, we might agree with respondents that delegation has been shown here. * * * Before we are

asked to judge whether, in the context of security clearance cases, a person may be deprived of the right to follow his chosen professions without full hearings where accusers may be confronted, it must be made clear that the President or Congress, within their constitutional powers specifically has decided that the imposed procedures are necessary and warranted and have authorized their use. * * * Such decisions cannot be assumed by acquiescence or non-action. * * * They must be made explicitly not only to assure that individuals are not deprived of cherished rights under procedures not actually authorized. * * * but also because explicit action, especially in areas of doubtful constitutionality, requires careful and purposeful consideration by those responsible for enacting and implementing our laws. Without explicit action by lawmakers, decisions of great constitutional import and effect would be relegated by default to administrators who, under our system of government, are not endowed with authority to decide them.

"Where administrative action has raised serious constitutional problems, the Court has assumed that Congress or the President intended to afford those affected by the action the traditional safeguards of due process. See, e. g., The Japanese Immigrant Case [Kaoru Yamataya v. Fisher] 189 U.S. 86, 101, 23 S.Ct. 611, 614, 47 L.Ed. 721; Dismuke v. United States, 297 U.S. 167, 172, 56 S.Ct. 400, 80 L.Ed. 561; Ex parte Endo, 323 U.S. 283, 299–300, 65 S.Ct. 208, 217, 89 L.Ed. 243; American Power & Light Co. v. Securities and Exchange Commission, 329 U.S. 90, 107–108, 67 S.Ct. 133, 143, 91 L.Ed. 103; Hannegan v. Esquire, 327 U.S. 146, 156, 66 S.Ct. 456, 461, 90 L.Ed. 586; Wong Yang Sung v. McGrath, 339 U.S. 33, 49, 70 S.Ct. 445, 453, 94 L.Ed. 616;

C. F. Anniston Mfg. Co. v. Davis, 301 U.S. 337, 57 S.Ct. 816, 81 L.Ed. 1143; United States v. Rumely, 345 U.S. 41, 73 S.Ct. 543, 97 L.Ed. 770. These cases reflect the Court's concern that traditional forms of fair procedure not be restricted by implication or without the most explicit action by the Nation's lawmakers, even in areas where it is possible that the Constitution presents no inhibition."

Moreover, even if we were to ignore Greene, which we have no right to do and certainly will not do, we would still reject the government's argument of implication. The rejection by Congress of more extensive rules is neither explicit nor implied authority to eliminate the fundamental safeguards under the circumstances here present. It is true that Congress refused to explicitly provide the safeguards, but it is equally true that there is nothing in the history of this legislation to show *that Congress even considered writing into the Act any power of the Commission to do away with apprisal, confrontation, and cross-examination.* The silence of Congress was apparently the product of thoughtful compromise. Some members of Congress positively wanted the fundamental safeguards spelled out, while others probably would have approved legislation specifically denying the accused these rights. *Congress remained silent.*

In Greene the Court specially found that the Defense Department *had been authorized* to fashion and apply an industrial clearance program but that the Department had not shown that either Congress or the President had *explicitly authorized* proceedings in which the ac-cused was not afforded the safeguards of confrontation and cross-examination. In Greene the President, in general terms, had authorized the Department of Defense to create procedures to restrict the dissemination of classified information, and had apparently acquiesced in the elaborate program established by the Secretary of Defense which denied investigated parties of the rights of confrontation and cross-examination. The case for authorization there was stronger than here; e. g., in Greene, Part IV, § 2 of Executive Order 9835, 5 U.S.C.A. § 631 note, specifically stated:

" * * * the investigative agency may refuse to disclose the names of confidential informants, provided it furnishes sufficient information about such informants on the basis of which the requesting department or agency can make an adequate evaluation of the information furnished by them, and provided it advises the requesting department or agency in writing that it is essential to the protection of the informants or to the investigation of other cases that the identity of the informants not be revealed * * * "

Justice Clark, dissenting, thought the authorization was specific:

"How the Court can say, despite these facts, that the President had not sufficiently authorized the program is beyond me, unless the Court means that it is necessary for the President to write out the Industrial Security Manual in his own hand."

The Supreme Court, by an 8–1 majority, rejected the authorization as being insufficient.[17] We are not free to do otherwise here.

---

17. Equally as decisive on the issue of explicit authorization in areas of doubtful constitutionality is Kent v. Dulles, 357 U.S. 116, 78 S.Ct. 1113, 2 L.Ed.2d 1204. There, Congress had enacted legislation requiring every passport application to "contain a true recital of each and every matter of fact which may be required by * * * any rules" of the Secretary of State, and that require-ment had to be satisfied "[b]efore a passport is issued to any person." 22 U.S. C.A. § 213. In this context, the Secretary asked for, and petitioners refused to file, the required affidavits stating whether they then were or ever had been members of the Communist party. Thereupon, the Secretary refused to further consider petitioners' application until such time as they filed the required

The conclusion is inevitable here that the burden is upon the government to show the "explicit action" by Congress authorizing the adoption of the rules which refuse to permit cross-examination, confrontation, and apprisal. In this case the government has made no attempt to point to any "explicit action" of authorization. Congress has made no such authorization, and absent such an explicit authorization, the rules in these particulars are clearly ultra vires.

## The Equities

Proper voting practices are the cornerstone upon which our democratic balance is maintained. Discrimination upsets that balance. Moreover, discrimination clearly violates the Constitution. Steps designed to determine whether there has been discrimination are therefore of grave public interest and importance. When there are charges, as there are here, which state that by one means or another the vote is being denied to a qualified person, the public interest will be served by learning all the facts. Certainly, the surest way of finding out all the facts is to hear from everybody, and the surest test of a witness' veracity is his confrontation and cross-examination.

Government counsel seem to say in their briefs that their investigation is so very important that this Court should not hold that the traditional safeguards should be afforded the registrars. We in no way disagree with counsel for the government concerning the value they place on the precious right to vote. But search as we have, we find nothing inimical to the government's interest in giving to the registrars the rights they insist upon here. The ultimate goal of Congress in creating the Commission was to find out all of the facts—the truth, not just possibly prejudiced opinion—so as to be able to safeguard the free exer-

cise of the voting right, subject to the legitimate power of the state to prescribe non-discriminatory and fair voting qualifications. Often in cases of this nature the Court must balance between individual and governmental interests. Here, we examine the record for that purpose and find no conflict. No better procedure exists for finding out the truth than to give the accused notice of the case against him and full opportunity to meet it. Hearings so conducted generate a feeling, so vital in a popular government, that justice is being done.

We have dealt at length with the immediate and irreparable damage that would be caused the registrars by forcing them to proceed without giving them their basic and traditional rights. No good purpose would be served by reviewing that phase of the case. Suffice it to say that we stand on what we have said and we agree with Judge Dawkins' original opinion—that these registrars are faced with immediate and irreparable injury. What damage, what injury, will the Commission suffer by giving to these registrars their traditional safeguards of due process of law, and by affording them the tenets of natural justice? In our humble opinion, all the Commission will suffer is perhaps a little inconvenience. It may take them three days rather than one to get the facts. How best can they perform the major task of "finding out all the facts" than to give the persons investigated the basic legal safeguards. We have searched in vain throughout the extensive briefs filed by the government in an effort to find out what irreparable damage, or what damage at all, could be done the Commission by prohibiting them from holding a hearing pursuant to these "ultra vires" rules and resolutions.

We do find in various parts of the government's briefs several statements

---

affidavits. The scholars, the courts, the Chief Executive, and the Attorney General all agreed that the issuance of passports had for years been a "discretionary act" on the part of the State Department. The Supreme Court decided that in order for the Secretary to deny a passport to

a Communist whose travel abroad would be inimical to our national security, Congress must so provide in explicit terms. The Court once again had construed very narrowly the delegated power to curtail or dilute substantial and fundamental rights.

or intimations as to damage. It was suggested that irreparable damage will be suffered because the Commission will expire in November. The recent action of Congress in extending the life of the Commission dispels this argument.

The government also suggests that if copies of the accusations and the names of the accusers were furnished the registrars it might result in the accusers being prosecuted for perjury. That is a strange argument—if one person makes a written allegation under oath that another has committed a crime and this oath turns out to be untrue, the public interest does not require that the government protect the perjurer. The government also argues that the Court should take judicial notice of the possible pressure to which persons making complaints in this field are subject under present circumstances. This Court does not know of a single instance where any such pressure has actually been brought. Some honest, sincere, and well-meaning people really believe this, but we are not going to assume (in the total absence of evidence) that the people of this State will be guilty of such a practice. Finally, the government argues that there is no point in telling these people what they did because they are the registrars and they *know* what they did. This contention assumes the registrars' guilt, an assumption which itself does violence to the American concept of justice—that all persons accused of crime are presumed to be innocent until proven guilty by competent evidence.

Insofar as the right to cross-examination is concerned, the government offers no reason why this should be denied. They merely say that they do not have to give it because congressional committees do not, and that Congress did not intend them to do it.

The Commission has authority to hold public hearings on vital public issues. Knowledge and understanding of every element of the problem will give greater clarity and perspective to one of the most difficult questions facing our country. Such a study, such an investigation, fairly conducted, will tend to unite responsible people in a common effort to solve these problems. Investigation and hearings will bring into proper focus the areas of responsibility of the federal government and of the states under our constitutional system. Through greater public understanding, therefore, the Commission may chart a course of progress to guide us in the years ahead, but a fact finding investigation conducted as this one is proposed to be conducted can result only in misunderstanding, suspicion, hostility, and unneeded bitterness.

Natural justice would not require confrontation, apprisal, and cross-examination in every hearing of the Commission, but only in instances where, as here, the record makes it abundantly clear that those being investigated are accused and suspected of criminal conduct.

■ Believing as we do that the procedures and the rules of the Commission in the particulars heretofore discussed are ultra vires and threaten the registrars with immediate and irreparable damage, and believing further that the interests of the government, the public, and the Commission will best be served by the holding of a full and fair hearing wherein all accused of crimes are given a fair chance to develop all the facts, we have but one course to take —that is to dismiss the government's motion for summary judgment and grant the prayer for an injunction, in accordance with this opinion.

WISDOM, Circuit Judge (dissenting).

I concur in the holding that the Act is constitutional and that the Administrative Procedure Act is inapplicable. I feel compelled, however, to dissent from the holding that under Greene v. McElroy the rules of the Commission are ultra vires.

I.

The Commission's rules may be inadequate, in terms of traditional safeguards accorded a defendant in a criminal trial, but they are the rules Con-

gress authorized for hearings by the Civil Rights Commission.

This case differs radically from Greene v. McElroy. Here, Congress took pains to set out in the Act, in its delegation of authority, mandatory rules of procedure to be followed by the Commission. The Commission's rules follow the language of the statute or are based on the intent of the statute.[1] Thus, on the important issue of the right of cross-examination, the Commission rule provides: "Interrogation of witnesses at hearings shall be conducted only by authorized staff personnel."[2] This is based on the statutory provision, Section 102 (c): "Witnesses at the hearings may be accompanied by their own counsel for the purpose of advising them concerning their constitutional rights." The limitation of the activities of a lawyer to giving advice to his client on constitutional rights is just a way of saying that the lawyer (or his client) cannot cross-examine an adverse witness.

A central issue in the controversy over civil rights legislation was whether witnesses should have the traditional safeguards of notice, confrontation, and cross-examination. The 1956 Civil Rights Bill, H.R. 627, as reported by the House Judiciary Committee, contained no special rules of procedure. H. Rep. No. 2187, 84 Cong. 2d Sess. It was amended on the floor of the House by the addition of elaborate safeguards which Representative Dies of Texas proposed. 102 Cong. Rec. 13542, 13548. This amendment required notice of the subject of the inquiry and confrontation, and allowed limited cross-examination. The bill passed the House, but no action was taken on it in the Senate.

In 1957 several bills were introduced containing the same procedural provisions as the 1956 bill, as amended. One of these was S. 83, the subject of Senate hearings in 1957.[3] The position of the Department of Justice, as stated by the Attorney General, was that "it would be a mistake to make [civil rights legislation] the vehicle for experimenting with new rules". Hearings, Senate Judiciary Committee, 85 Cong., 1st Sess., p. 14. In the House hearings on the 1957 Civil Rights proposal Senator, then Representative, Keating asked Attorney General Brownell if the Department would object to the Committee inserting in the bill a provision "similar to those set up in the rules of the House for the conduct of congressional committees". General Brownell stated that the Department had no objection to such rules of procedure. H.R. 6127, adopted into law as the Civil Rights Act of 1957, incorporated the House "Fair Play Rules[4]" as Section 102 of the Act[5].

The action of Congress in refusing to adopt a particular bill and adoption of another bill is often an unreliable guide to congressional intent. But the circumstances in which H.R. 6127 became law, rather than S. 83 or H.R. 627, make it clear that Congress, after careful deliberation, made a choice of procedures. Congress rejected the traditional safeguards accorded a defendant in a criminal trial and accepted the House "Fair Play Rules".

The House "Fair Play Rules" were drawn for the conduct of congressional investigating committees. They were the indirect product of innumerable legal articles, judicial dicta, and editorials[6].

1. See Appendix A and Appendix B.

2. This is the rule invariably followed by committees of the House and Senate. It permits a form of cross-examination: submission of written questions to be put to the witness by the Chairman—for whatever that is worth as cross-examination.

3. See Appendix C.

4. Amendment to Rule XI(25) of the Rules of the House of Representatives. Adopt-

ed March 23, 1955, 101 Cong.Rec. 3569–85; House Resolution 151, Rules and Manual, United States House of Representatives, 1959, section 735(i)–(q).

5. Section 102(a) through 102(i) of the statute is identical with the House "Fair Play Rules".

6. For a discussion of the various proposals for a code of procedure before congressional committees, see Maslow, Fair Procedure in Congressional In-

They were the direct product of careful study [7]. It is safe to say that when the House "Fair Play Rules" were adopted as Section 102 of the Civil Rights Act of 1957 every member of the House and Senate regarded that action as an explicit declaration that Congress affirmatively rejected rules extending to witnesses the rights of notice, confrontation, and cross-examination; that, instead, Congress authorized and directed the Civil Rights Commission to follow its more limited "Fair Play Rules".

This background distinguishes the case from Greene v. McElroy. There, the majority's reasoning was the President and Congress would not have delegated to the Department of Defense the power to deprive a man of his job as a result of a hearing in which he has no right of confrontation or cross-examination, without including in the delegation express authorization to by-pass the traditional due process safeguards. Here, Congress expressly authorized the by-pass.

## II.

I therefore reach the issue of the constitutionality of the procedure.

A hearing subjecting a subpoenaed witness to public opprobrium, loss of reputation, loss of a job, and possible state and federal prosecution based on testimony brought out at the hearing, carries sanctions no less severe than a criminal trial. Fundamental fairness would seem to require that such a witness have the opportunity to assert the rights of notice, confrontation, cross-examination, and other due process safeguards. No court however has gone that far.

Mr. Justice Clark, the only member of the Supreme Court who reached the constitutional issue in Greene, stated: "(T)his Court has long ago and repeatedly approved administrative action where the right of cross-examination and confrontation were not permitted." 360 U.S. 474, 79 S.Ct. 1423.

vestigations: A Proposed Code, 54 Cal. L.Rev. 839 (1954). For the code proposed by the American Bar Association, see 40 Am.Bar Ass'n Journ. 900 (1954). See the following, some before and some after adoption of the Fair Play Rules, some dealing directly with the procedure before congressional committees and some dealing with the rights of witnesses generally in hearings before investigative or administrative bodies; Landis, Constitutional Limitations on the Congressional Power of Investigation, 40 Harv.L.Rev. 1953 (1926); Potts, Power of Legislative Bodies to Punish for Contempt, 74 U. of Pa.L.Rev. 691 (1926); Herweitz and Mulligan, The Legislative Investigating Committee, 33 Cal.L.Rev. 1 (1933); Morgan, Congressional Investigations and Judicial Review; Kilbourn & Thompson Revisited, 37 Cal.L.Rev. 556 (1949); Davis, The Requirement of Opportunity to be Heard in the Administrative Process, 51 Yale L.Journ. 1091 (1942); Liacos, Rights of Witnesses Before Congressional Committees, 33 Bos.U.L.Rev. 337 (1953); Symposium on Legislative Investigations: Safeguards of Witnesses, 29 Notre Dame Law., 157 (1954); Keating, The Investigating Power of Congress, 14 Fed.Bar Jour. 171 (1954); Kefauver, A Code of Conduct for Congressional Investigations, 8 Ark.L.Rev. 369 (1954);

Chase, Improving Congressional Investigations, 30 Temp.L.Q. 126 (1957); Davis, Requirements of a Trial-Type Hearing, 70 Harv.L.Rev. 193 (1956); McKay, The Right of Confrontation, Wash.U.L.Q. 122 (1959). See the following recent notes and comments: Due Process and the Right to Counsel, 33 St. John's L.Rev. 67 (1957); The Civil Rights Act of 1957 and Contempt of Court, 48 Cornell L.Q. 661 (1958); Constitutional Limitations on the Legislative Power of Investigations, 7 Buffalo L.Rev. 267 (1958); Representation by Counsel, 58 Cal.L.Rev. 395 (1958). See also Barth, Government by Investigation (Viking Press., N.Y.1955) and Taylor, Grand Inquest (Simon & Schuster, N.Y.1955).

7. In 1954 both houses of Congress held extensive hearings on the matter of committee procedures. Hearings before the Subcommittee on Legislative Procedure of the House Rules Committee, Legislative Procedure, 83d Cong., 2d Sess. (1954); Hearings before the Subcommittee on Rules of the Senate Rules and Administration Committee, Rules of Procedure for Senate Investigating Committees, 83d Cong., 2d Sess. (1954). See also Report of Senate Committee on Rules and Administration to accompany S.Res. 17, Rules of Procedure for Senate Investigating Committees, 84th Cong., 1955.

Without exception, the courts have drawn a distinction between investigative and adjudicative proceedings. Witnesses in investigative hearings do not have the constitutional rights of a witness in an adjudicative hearing. The Fifth Amendment gives a witness protection in an investigation; the opportunity to assert all due process rights in any later adjudicative proceeding is a sufficient protection [8]. In re Groban, 1957, 352 U.S. 330, 77 S.Ct. 510, 1 L.Ed.2d 376; Bowles v. Baer, 7 Cir., 1954, 142 F.2d 787; Norwegian Nitrogen Products Co. v. United States, 1932, 288 U.S. 294, 53 S.Ct. 350, 77 L.Ed. 796.

In Groban a majority of the Supreme Court went very far indeed in denying the right to counsel. An Ohio statute, authorizing the State Fire Marshal to investigate the cause of fires, conferred broad powers on the investigating officer. He could hold the investigation in private, exclude counsel, punish witnesses who refuse to testify by summarily committing them to jail, and, if he believed the evidence would warrant a conviction for arson or a similar crime, he could arrest the witness after the investigation. The appellants, who were called upon to testify concerning the cause of a fire at their place of business, refused to testify in the absence of counsel. They were committed to jail. In a habeas corpus proceeding, they contended that they had a constitutional right to counsel under the due process clause of the Fourteenth Amendment. The court held, five to four, that appellants had no constitutional right to counsel in giving testimony before an investigative body that does not adjudicate legal rights and responsibilities. If Groban was not entitled to counsel and to protections encompassed in the concept of due process, no witness is entitled to due process in an investigation.

Taking the law as it is, the Commission's rules are constitutional.

### III.

The rub in this case comes from the Act itself. It comes from the incongruity of a legislative commission of inquiry investigating specific complaints against individuals accused of crimes [9]. To my mind, the creation of such a commission carries grave danger of legislative usurpation. It is of questionable legislative propriety, at best.

The investigation of specific violations of the law is for grand juries, not legislative commissions. With all deference to Congress, a commission, constituted to investigate a broad problem of national interest, has no business holding hearings that must inevitably develop into legislative trials of individuals. When a subpoenaed witness accused of a crime may be subjected to trial by exposure, a fact-finding determination and punishment, he should have the same rights of notice, confrontation, cross-examination, and all the other hard-earned rights embodied in due process that anyone accused of breaking the law is entitled to when he is tried by a jury before a judge. The Commission does not formally adjudicate guilt or impose a formal sentence, but an individual against whom a complaint is made to the Commission may be exposed to all the hardships of a trial and to punishment in many forms.

The House "Fair Play Rules" are a step in the proper direction—for congressional committees. Procedures suitable for Congress' own committees, however, are less than adequate for a trial by an autonomous commission to which

---

8. Proponents of the legislation emphasized repeatedly; "The Commission created by the proposal is purely investigatory and empowered only to make recommendations". H.Rep. No. 291, 85th Cong. 1st Sess., p. 6.

9. Section 104(a) (1) of the Act (Duties of the Commission) provides: "The Commission shall—(1) investigate allegations in writing under oath or affirmation that certain citizens of the United States are being deprived of their right to vote and have that vote counted by reason of their color, race, religion, or national origin; which writing, under oath or affirmation, shall set forth the facts upon which such belief or beliefs are based;"

Congress has delegated its power of inquiry.

The high purposes animating the creation of the Civil Rights Commission do not diminish the inherent dangers in hearings apt to degenerate into legislative trials. They simply obscure the dangerous means used to attain the ends of the legislation.

These, however, are considerations for Congress [10], as long as Groban and Greene v. McElroy (as I read it) state the law.

## Appendix A
### Rules of Procedure of the Commission

Sec. 102(a) The Chairman or one designated by him to act as Chairman at a hearing of the Commission shall announce in an opening statement the subject of the hearing.

(b) A copy of the Commission's rules shall be made available to the witness before the Commission.

(c) Witnesses at the hearings may be accompanied by their own counsel for the purpose of advising them concerning their constitutional rights.

(d) The Chairman or Acting Chairman may punish breaches of order and decorum and unprofessional ethics on the part of counsel, by censure and exclusion from the hearings.

(e) If the Commission determines that evidence or testimony at any hearing may tend to defame, degrade, or incriminate any person, it shall (1) receive such evidence or testimony in executive session; (2) afford such person an opportunity voluntarily to appear as a witness; and (3) receive and dispose of requests from such person to subpoena additional witnesses. (f) Except as provided in sections 102 and 105(f) of this Act, the Chairman shall receive and the Commission shall dispose of requests to subpena additional witnesses.

(g) No evidence or testimony taken in executive session may be released or used in public sessions without the consent of the Commission. Whoever releases or uses in public without the consent of the Commission evidence or testimony taken in executive session shall be fined not more than $1,000, or imprisoned for not more than one year.

(h) In the discretion of the Commission, witnesses may submit brief and pertinent sworn statements in writing for inclusion in the record. The Commission is the sole judge of the pertinency of testimony and evidence adduced at its hearings.

(i) Upon payment of the cost thereof, a witness may obtain a transcript copy of his testimony given at a public session or, if given at an executive session, when authorized by the Commission.

(j) A witness attending any session of the Commission shall receive $4 for each day's attendance and for the time necessarily occupied in going to and returning from the same, and 8 cents per mile for going from and returning to his place of residence. Witnesses who attend at points so far removed from their respective residences as to prohibit return thereto from day to day shall be entitled to an additional allowance of $12 per day for expenses of subsistence, including the time necessarily occupied in going to and returning from the place of attendance. Mileage payments shall be tendered to the witness upon service of a subpena issued on behalf of the Commission or any subcommittee thereof.

(k) The Commission shall not issue any subpena for the attendance and testimony of witnesses or for the production of written or other matter which would require the presence of the party subpenaed at a hearing to be held outside of the State, wherein the witness is found or resides or transacts business.

## Appendix B

In addition to these statutory provisions, the Commission has adopted the

---

10. The inclusion in the body of the statute of mandatory rules of procedure is unique in legislation setting up an investigatory commission. This, and the provision requiring application to a court for enforcement of process indicate congressional sensitivity to the problem.

following supplementary Rules of Procedure:

(a) All the provisions of Section 102 of Public Law 85–315, incorporated in Rule 2 above, shall be applicable to and govern the proceedings of all subcommittees appointed by the Commission pursuant to Section 105(f) of Public Law 85–315, incorporated in Rule 1 above.

(b) At least two members of the Commission must be present at any hearing of the Commission or of any sub-committee thereof.

(c) The holding of hearings by the Commission or the appointment of a subcommittee to hold hearings pursuant to the Provisions in Rule 1 above must be approved by a majority of the members of the Commission or by a majority of the members present at which at least a quorum of four members is present.

(d) Subpenas for the attendance and testimony of witnesses or the production of written or other matter may be issued over the signature of the Chairman of the Commission by the Chairman or by the Chairman upon the request of a member of the Commission.

(e) Subpenas for the attendance and testimony of witnesses or the production of written or other matter may be issued over signature of the Chairman of a subcommittee appointed pursuant to the provisions of Rule 1 above by the Chairman or by the Chairman upon the request of a member of the subcommittee.

(f) An accurate transcript shall be made of the testimony of all witnesses in all hearings, either public or executive sessions, of the Commission or of any subcommittee thereof. Each witness shall have the right to inspect the record of his own testimony. A transcript copy of his testimony may be purchased by a witness pursuant to Rule 2(i) above. Transcript copies of public sessions may be obtained by the public upon payment of the cost thereof.

(g) Any witness desiring to read a prepared statement in a hearing shall file a copy with the Commission or subcommittee 24 hours in advance. The Commission or subcommittee shall decide whether to permit the reading of such statement.

(h) The Commission or subcommittee shall decide whether written statements or documents submitted to it shall be placed in the record of the hearing.

(i) Interrogation of witnesses at hearings shall be conducted only by members of the Commission or by authorized staff personnel.

(j) If the Commission pursuant to Rule 2(e), or any subcommittee thereof, determines that evidence or testimony at any hearing may tend to defame, degrade, or incriminate any person, it shall advise such person that such evidence has been given and it shall afford such person an opportunity to read the pertinent testimony and to appear as a voluntary witness or to file a sworn statement in his behalf.

(k) Subject to the physical limitations of the hearing room and consideration of the physical comfort of Commission members, staff, and witnesses, equal and reasonable access for coverage of the hearings shall be provided to the various means of communications, including newspapers, magazines, radio, news reels, and television. However, no witness shall be televised, filmed or photographed during the hearing if he objects on the ground of distraction, harassment, or physical handicap.

Appendix C S. 83

Rights of Persons Adversely Affected by Testimony

(q) a person shall be considered to be adversely affected by evidence or testimony of a witness if the Commission determines that; (i) the evidence or testimony would constitute libel or slander if not presented before the Commission or (ii) the evidence or testimony alleges crime or misconduct or tends to disgrace or otherwise to expose the person to public contempt, hatred, or scorn.

(r) Insofar as practicable, any person whose activities are the subject of investigation by the Commission, or about

whom adverse information is proposed to be presented at a public hearing of the Commission, shall be fully advised by the Commission as to the matters into which the Commission proposes to inquire and the adverse material which is proposed to be presented. Insofar as practicable, all material reflecting adversely on the character or reputation of any individual which is proposed to be presented at a public hearing of the Commission shall be first reviewed in executive session to determine its reliability and probative value and shall not be presented at a public hearing except pursuant to majority vote of the Commission.

(s) If a person is adversely affected by evidence or testimony given in a public hearing, that person shall have the right; (i) to appear and testify or file a sworn statement in his own behalf, (ii) to have the adverse witness recalled upon application made within thirty days after introduction of such evidence or determination of the adverse witness' testimony, (iii) to be represented by counsel as heretofore provided, (iv) to cross-examine (in person or by counsel) such adverse witness, and (v), subject to the discretion of the Commission, to obtain the issuance by the Commission of subpenas for witnesses, documents, and other evidence in his defense. Such opportunity for rebuttal shall be afforded promptly and, so far as practicable, such hearing shall be conducted at the same place and under the same circumstances as the hearing at which adverse testimony was presented.

Cross-examination shall be limited to one hour for each witness, unless the Commission by majority vote extends the time for each witness or group of witnesses.

(t) If a person is adversely affected by evidence or testimony given in executive session or by material in the Commission files or records, and if public release of such evidence, testimony, or material is contemplated, such person shall have, prior to the public release of such evidence or testimony or material or any disclosure of or comment upon it by members of the Commission or Commission staff or taking of similar evidence or testimony in a public hearing, the rights heretofore conferred and the right to inspect at least as much of the evidence or testimony of the adverse witness or material as will be made public or the subject of a public hearing.

(u) Any witness (except a member of the press who testifies in his professional capacity) who gives testimony before the Commission in an open hearing which reflects adversely on the character or reputation of another person may be required by the Commission to disclose his sources of information, unless to do so would endanger the national security.