# ANONYMOUS NOS. 6 AND 7 *v.* BAKER, JUSTICE OF THE SUPREME COURT OF NEW YORK.

No. 378.   Argued March 25, 1959.—Decided June 15, 1959.

*Raphael H. Weissman* argued the cause and filed a brief for appellants.

*Denis M. Hurley* argued the cause for appellee. With him on the brief were *Michael A. Castaldi* and *Michael Caputo.*

MR. JUSTICE HARLAN delivered the opinion of the Court.

Appellants have been convicted of contempt for refusal to answer pertinent questions put to them as witnesses summoned in a state judicial Inquiry into alleged improper practices at the local bar. The sole issue before us is whether this conviction offended the Due Process Clause of the Fourteenth Amendment to the Federal Constitution by reason of the fact that the justice in charge of the Inquiry had required counsel retained by appellants to remain outside the hearing room while they were being interrogated, even though he expressed his readiness to suspend the course of questioning whenever appellants wished to consult with counsel. No claim is made that appellants were not fully represented by counsel in the contempt proceedings themselves or that such proceedings were otherwise lacking in due process.

On January 21, 1957, the Appellate Division of the Supreme Court of the State of New York, Second Department, acting pursuant to § 90 of the State Judiciary Law, 29 N. Y. Laws Ann. § 90 (McKinney 1948), and in response to a petition of the Brooklyn Bar Association charging "ambulance chasing" and related unethical

practices among segments of the Kings County Bar,[1] ordered an investigation into these alleged conditions by an Additional Special Term of the Supreme Court, Mr. Justice Arkwright presiding.[2]

Appellants, licensed private detectives and investigators, but not attorneys, appeared before the Special Term pursuant to witness subpoenas, accompanied by counsel. The presiding justice, acting upon the authority of an appellate decision made during the course of this same Inquiry, *Matter of M. Anonymous* v. *Arkwright*, 5 App. Div. 2d 790, 170 N. Y. S. 2d 535, leave to appeal denied, 4 N. Y. 2d 676, 173 N. Y. S. 2d 1025, 149 N. E. 2d 538, informed appellants that their counsel would not be allowed in the hearing room while they were being questioned, but that they would be free to consult with him at any time during their interrogation. Solely because of that limitation upon the participation of counsel, appellants thereafter refused to answer all manner of questions put to them. Their conviction for contempt, carrying a sentence of 30 days' imprisonment, followed.[3] The Appellate Division affirmed, 6 App. Div. 2d 719, 176 N. Y. S. 2d 227, and the New York Court of Appeals, finding that

---

[1] The petition of the Bar Association alleged, among other things: "That such practices result in the following: unfair agreements of retainer; maintenance by lawyers of some system of obtaining prompt information of accidents; congestion of court calendars by unworthy causes which are never intended to be brought to trial; a false conception by lawyers engaged in this practice that the relationship between attorney and client is a commercial transaction in which the interest of the client plays an unimportant part; impairment of public confidence in the Courts; and delay in the administration of justice.".

[2] Upon Mr. Justice Arkwright's retirement on December 31, 1958, the Appellate Division designated Mr. Justice Edward G. Baker of the New York Supreme Court as his successor.

[3] Each appellant was enlarged on bail after serving two days of his sentence.

"no substantial constitutional question is involved," dismissed ensuing appeals. 4 N. Y. 2d 1034, 1035, 152 N. E. 2d 651, 177 N. Y. S. 2d 687. Appellants, proceeding under 28 U. S. C. § 1257 (2),[4] then appealed to this Court, and we postponed further consideration of jurisdiction to a hearing on the merits. 358 U. S. 891.

Dealing first with the question of our jurisdiction, we think it clear that this appeal must be dismissed. It is predicated on the ground that the state courts held valid under the Federal Constitution § 90 (10) of New York's Judiciary Law (see Note 6, *infra*), said to be the basis of the Special Term procedure here attacked. However, it appears that the federal constitutionality of § 90 (10) was never "drawn in question" or passed upon in the state courts; the Appellate Division, from whose decision the Court of Appeals denied leave to appeal, simply relied on the earlier cases of *Matter of M. Anonymous* v. *Arkwright, supra,* and *Matter of S. Anonymous* v. *Arkwright,* 5 App. Div. 2d 792, 170 N. Y. S. 2d 538, which in turn appear not to have involved such an adjudication. In these circumstances we must hold that we lack jurisdiction under 28 U. S. C. § 1257 (2). Nevertheless, treating the appeal as a petition for writ of certiorari, we grant the writ. 28 U. S. C. § 2103.

We turn to the merits. An understanding of the nature of the proceedings before the Special Term is first necessary. In New York the traditional powers of the courts

---

[4] "Final judgments or decrees rendered by the highest court of a State in which a decision could be had, may be reviewed by the Supreme Court as follows:

"(2) By appeal, where is drawn in question the validity of a statute of any state on the ground of its being repugnant to the Constitution, treaties or laws of the United States, and the decision is in favor of its validity."

over the admission, discipline, and removal, of members
of the bar is placed by law in the Appellate Division of
the State Supreme Court. N. Y. Judiciary Law § 90.
When the Appellate Division is apprised of conditions
calling for general inquiry it usually appoints, as here, a
Justice of the Supreme Court, sitting at Special Term,
to make a preliminary investigation. The duties of such
a justice are purely investigatory and advisory, culminat-
ing in one or more reports to the Appellate Division upon
which future action may then be based. In the words of
Mr. Justice Cardozo, then Chief Judge of the New York
Court of Appeals, the proceedings at Special Term thus
simply constitute a "preliminary inquisition, without
adversary parties, neither ending in any decree nor estab-
lishing any right . . . a quasi-administrative remedy
whereby the court is given information that may move
it to other acts thereafter . . . ." *People ex rel. Karlin*
v. *Culkin,* 248 N. Y. 465, 479, 162 N. E. 487, 492.

Customarily the proceedings at Special Term are con-
ducted in private, for reasons which Mr. Justice Cardozo
explained in the *Karlin* case as follows (248 N. Y., at
478–479, 162 N. E., at 492):

> "The argument is pressed that in conceding to the
> court a power of inquisition we put into its hands a
> weapon whereby the fair fame of a lawyer, however
> innocent of wrong, is at the mercy of the tongue of
> ignorance or malice. Reputation in such a calling
> is a plant of tender growth, and its bloom, once lost,
> is not easily restored. The mere summons to appear
> at such a hearing and make report as to one's conduct,
> may become a slur and a reproach. Dangers are
> indeed here, but not without a remedy. The remedy
> is to make the inquisition a secret one in its prelimi-
> nary stages. This has been done in the first judicial

department, at least in many instances, by the order of the justice presiding at the hearing. It has been done in the second judicial department . . . by order of the Appellate Division directing the inquiry. A preliminary inquisition . . . is not a sitting of a court within the fair intendment of section 4 of the Judiciary Law whereby sittings of a court are required to be public. . . . The closest analogue is an inquisition by the grand jury for the discovery of crime."

By analogy to grand jury proceedings counsel are not permitted to attend the examination of witnesses called in such an investigation, cf. *People ex rel. McDonald* v. *Keeler,* 99 N. Y. 463, 485, 2 N. E. 615, 626–627,[5] although the New York courts have held that the Special Term may in its discretion permit such attendance where it appears that the witness himself is a target of the inquiry. See *Matter of M. Anonymous* v. *Arkwright, supra,* 5 App. Div. 2d, at 791, 170 N. Y. S. 2d, at 538.

These practices have received legislative approval, evidenced by § 90 (10) of the State Judiciary Law, quoted in the margin,[6] and by the Legislature's refusal in 1958

---

[5] In investigations of this kind New York has deemed "the presence of lawyers . . . not conducive to the economical and thorough ascertainment of the facts." *In re Groban,* 352 U. S. 330, 335, 336 (concurring opinion). In an interim report, release of which was authorized by the Appellate Division, Mr. Justice Arkwright stated that from March of 1957 to June of 1958 the Inquiry issued 4,875 "request" subpoenas, 2,150 witness and *duces tecum* subpoenas, and examined the records of approximately 5,000 insurance companies. During the same period the Inquiry's staff examined informally about 2,500 persons, and from May of 1957 to June of 1958 some 726 witnesses were interrogated before the Special Term itself.

[6] "Any statute or rule to the contrary notwithstanding, all papers, records and documents upon the application or examination of any person for admission as an attorney and counsellor at law and upon any complaint, inquiry, investigation or proceeding relating to the

to amend the State Civil Rights Law, 8 N. Y. Laws Ann. § 1–242 (McKinney 1948), so as to require that counsel be allowed to attend the interrogation of witnesses in proceedings of this character.[7]

---

conduct or discipline of an attorney or attorneys, shall be sealed and be deemed private and confidential. However, upon good cause being shown, the justices of the appellate division having jurisdiction are empowered, in their discretion, by written order, to permit to be divulged all or any part of such papers, records and documents. In the discretion of the presiding or acting presiding justice of said appellate division, such order may be made either without notice to the persons or attorneys to be affected thereby or upon such notice to them as he may direct. In furtherance of the purpose of this subdivision, said justices are also empowered, in their discretion, from time to time to make such rules as they may deem necessary. Without regard to the foregoing, in the event that charges are sustained by the justices of the appellate division having jurisdiction in any complaint, investigation or proceeding relating to the conduct or discipline of any attorney, the records and documents in relation thereto shall be deemed public records."

[7] A proposed bill would have added to the Civil Rights Law a new § 12–a, providing as follows: "Right of representation by counsel of persons called as witnesses in certain inquiries and investigations. Any person called as a witness by or before any . . . judicial investigating committee, . . . or before any judge, . . . authorized or directed to conduct any inquiry or investigation, whose testimony may tend to involve himself or any other person in any subsequent criminal or quasi-criminal prosecution or in any subsequent disciplinary proceeding for professional misconduct, . . . or the revocation or suspension of any license to engage in a profession, trade or business, shall have the right to be accompanied by his counsel who shall be entitled on behalf of his client to (a) object to the jurisdiction of the . . . inquiry . . . and to argue briefly thereon; (b) to confer privately with his client to advise him of his legal rights whenever his client requests such a conference; (c) to object to procedures deemed by him to violate his client's legal rights; and (d) question the witness on his behalf, at the conclusion of his direct testimony, on any matter relevant to the subject of the inquiry or investigation, subject to such reasonable limitations as may be imposed by the officer presiding at such inquiry or investigation."

Thus, what we have here in the Appellate Division's order that the Inquiry be private [8] and in the Special Term's exclusion of counsel from the hearing room is not a procedural innovation by a particular court or judge in a particular case, but an expression of established state policy. We are now asked to declare that policy unconstitutional.

To do so would not only necessitate our ignoring the weighty considerations which support New York's policy, but would require us to limit state power in this area of investigation far beyond anything indicated by this Court's past "right to counsel" decisions under the Fourteenth Amendment. Although we have held that in state criminal proceedings, which these are not, *Matter of M. Anonymous* v. *Arkwright, supra,* a defendant has an unqualified right to be represented at trial by retained counsel, *Chandler* v. *Fretag,* 348 U. S. 3, we have not extended that right to the investigation stages of such proceedings. See *Cicenia* v. *LaGay,* 357 U. S. 504; see also *Crooker* v. *California,* 357 U. S. 433. Again, while it has been decided that there is a constitutional right to counsel in a criminal contempt proceeding, growing out of a state investigation, conducted before a judge sitting as

---

[8] The Appellate Division's order establishing the Special Term provided "that, for the purpose of protecting the reputation of innocent persons, the said inquiry and investigation shall be conducted in private, pursuant to the provisions of the Judiciary Law (Section 90, Subdivision 10); that all the facts, testimony and information adduced, and all papers relating to this inquiry and investigation, except this order, shall be sealed and be deemed confidential; and that none of such facts, testimony and information and none of the papers and proceedings herein, except this order, shall be made public or otherwise divulged until the further order of this court; and . . . that upon the conclusion of said inquiry and investigation the said Justice shall make and file with this court his report setting forth his proceedings, his findings and his recommendations."

a "One Man Grand Jury," *In re Oliver,* 333 U. S. 257,[9] we have held-that a witness examined in a state investigation conducted in private is not constitutionally entitled to the assistance of counsel while being interrogated. *In re Groban,* 352 U. S. 330.

In the *Groban* case we upheld the constitutionality of an Ohio statute [10] which, as construed by the Ohio courts, authorized the Fire Marshal to exclude from the hearing room counsel representing those summoned to testify before him in an investigation into the causes of a fire. We there said (at 332–333):

> "The fact that appellants were under a legal duty to speak and that their testimony might provide a basis for criminal charges against them does not mean that they had a constitutional right to the assistance of their counsel. Appellants here are witnesses from whom information was sought as to the cause of the fire. A witness before a grand jury cannot insist, as a matter of constitutional right, on being represented by his counsel, nor can a witness before other investigatory bodies. There is no more reason to allow the presence of counsel before a Fire Marshal trying in the public interest to determine the cause of a fire. Obviously in these situations evidence obtained may possibly lay a witness open to criminal charges. When such charges are made in a criminal proceeding, he then may demand the presence of his counsel for his defense. Until then his protection is the privilege against self-incrimination." (Footnotes omitted.)

The *Groban* case is controlling here and requires rejection of appellants' constitutional claims. As did Ohio in *Groban,* New York has a privilege against self-incrim-

---

[9] See p. 288, *supra;* Note 13, *infra.*

[10] Page's Ohio Rev. Code, 1954, § 3737.13.

ination, N. Y. Const., Art. I, § 6, which was freely exercised by other witnesses in this investigation,[11] and was fully available to these appellants. Moreover, the circumstance that this investigation was conducted by an experienced judge, rather than an administrative official, and the fact that appellants throughout their interrogation were freely given the right to consult counsel, notwithstanding his exclusion from the hearing room, make the constitutional claim here far less tenable than that found wanting in *Groban*.

Appellants seek to escape from *Groban* by arguing that they were summoned before the Special Term not as mere witnesses but with an eye to their future prosecution. This contention rests upon an informal "off the record" conversation which appellants and their counsel had with an assistant on the Inquiry's staff some four months before appellants were actually examined. In response to counsel's inquiry as to "what was wanted of his clients in this matter," the assistant made the replies set forth in the margin.[12]

---

[11] In the interim report already mentioned, Note 5, *supra*, Mr. Justice Arkwright stated:

"We have been scrupulous in apprising all attorneys of the stated purposes of the Inquiry as laid down by the Appellate Division, and witnesses, whenever required, have been advised of their constitutional rights.

"As many as 30 persons sworn as witnesses before the Additional Special Term have, as is their unquestioned right, invoked their constitutional privilege against self-incrimination, including 11 attorneys and 10 doctors. Faced with this roadblock, Counsel for the Inquiry has been forced to develop and to present independent evidence of the facts."

[12] ". . . I indicated that we did not intend to pussyfoot with them, we were not trying to trap them in any manner, but that testimony and evidence had come before us in the course of our investigation that someone in the employ of the Gotham Claims Service [appellants' partnership] had, with some frequency, obtained statements from defendants [in pending or prospective negligence

We think that the role in which these appellants were summoned to the Inquiry is to be judged by the actions of the Special Term, not by the statements of a subordinate staff member, evidently motivated by nothing more than a desire to avoid a plea of self-incrimination which would have blocked the Inquiry from obtaining possibly helpful information. The record shows that the Special Term, aware of the claims as to this occurrence, which it caused to be fully explored in the presence of appellants and their counsel, repeatedly assured appellants that they were

---

actions], holding themselves out to be from defendant's [insurance] carrier and also holding themselves out to be from other agencies, and in one instance the district attorney's office. That our investigation had disclosed that these statements had been tampered with, and that it was relative to this that we wished to speak to them to find out if these statements were actually taken by the Gotham Claims Service, for what attorneys these statements were taken, and whether the tampering was done by them or their employees or at the direction of some attorney.

"I told Mr. Zangara [appellants' counsel] that the interests of the Judicial Inquiry was primarily directed at the attorneys that they had done business with, that if they cooperated fully I felt that the Court would take that into consideration if something unethical had been done.

"I further stated that in my opinion there was prima facie evidence in the event that the clients decided to plead the Fifth Amendment, to refer this matter to the district attorney.

"I stated it was my opinion, I did not indicate that that would be done, I did not indicate that it was even being considered at the time. I was merely giving my opinion for which they had asked. I made it quite clear that this was all off the record, that they were asking what amounted to a favor, and I was being very frank and honest with them. And I was thanked for indicating to them what the picture was.

"In fact, I remember indicating that any final action on the matter would have to be on the part of your Honor [the Justice in charge of the Inquiry] and that the Appellate Division would finally rule as to what would actually be done."

before the Inquiry solely as witnesses.[13] That they might later be faced with criminal charges, adds nothing to their present constitutional claim. *In re Groban, supra,* at 332–333.

The final order of the Court of Appeals of the State of New York must be

*Affirmed.*

MR. JUSTICE BLACK, with whom THE CHIEF JUSTICE, MR. JUSTICE DOUGLAS and MR. JUSTICE BRENNAN concur, dissenting.

*In re Groban,* 352 U. S. 330, decided two years ago, upheld as constitutional the action of a state fire marshal in compelling persons suspected of burning a building to testify about the fire in secret and without benefit of the presence of their counsel. Four of us dissented on the ground that such secret inquisitions violated the Due

---

[13] The record shows that when appellants persisted in their recalcitrance despite the court's directions to answer, it called in counsel, informed him that it considered appellants' refusals contemptuous and directed him and appellants to reappear two days thereafter. At that time, the court heard argument by counsel why appellants should not be held in contempt. It then again told counsel that each appellant was "here merely as a witness, not as a defendant, not as a respondent. You understand what I am talking about. You can explain that to him." The court next explained the procedure it would follow as to each appellant:

"We are going to ask him some of the questions that were asked before and if he wishes to consult you, we will give him every opportunity to do so at any time during the questioning or any time that I direct.

". . . if you will retire from the courtroom we will call . . . [him] to the stand."

Appellants continued in refusing to answer. The court held them in contempt and recalled counsel for a hearing on the contention that their corridor conversation with the staff assistant established their status as defendants. It then heard argument by counsel on punishment, and imposed the challenged sentence.

Process Clause of the Fourteenth Amendment. In this case the Court upholds the action of a state judge in compelling testimony from persons suspected of getting statements of defendants in negligence cases under false pretenses and later "tampering" with these statements.* I think it violates due process for a judge no less than for a fire marshal to compel testimony to be given incommunicado. In fact it was Star Chamber judges who helped to make closed-door court proceedings so obnoxious in this country that the Bill of Rights guarantees public trials and the assistance of counsel. And secretly compelled testimony does not lose its highly dangerous potentialities merely because it represents only a "preliminary inquisition . . . whereby the court is given information that may move it to other acts thereafter." Nor does this record justify a holding that this inquisition adopted the mantle of secrecy and barred counsel from the room out of tender solicitude for the reputation of the defendants in this contempt case. Doubtless the defendants' lawyer and the defendants themselves are at least as capable and perhaps as much interested in saving their reputations as the judge who is sending them to jail.

The naked, stark issue here is whether a judge, who must actually try cases in public—or any other government official for that matter—can consistently with due process compel persons to testify and perhaps to lay the groundwork for their later conviction of crime, in secret chambers, where counsel for the State can be present but where counsel for the suspect cannot. In upholding such secret inquisitions the Court once again retreats from what I conceive to be its highest duty, that of maintaining

---

*Despite the judge's repeated statements that these persons were "witnesses" not defendants, the statement of a member of the judge's inquiry staff, set out in note 12 of the Court's opinion, makes it clear that they were suspected and under investigation for criminal conduct.

unimpaired the rights and liberties guaranteed by the Fourteenth Amendment and the Bill of Rights. Cf. *Bartkus* v. *Illinois,* 359 U. S. 121; *Frank* v. *Maryland,* 359 U. S. 360; *Barenblatt* v. *United States, ante,* p. 109; *Uphaus* v. *Wyman, ante,* p. 72. Here as in *Groban* my answer would be that no public official can constitutionally exercise such a dangerous power over any individual. I would therefore reverse this conviction.