■ In the Matter of JOHN A. SHAW, Petitioner, v. BOARD OF REGENTS OF THE UNIVERSITY OF THE STATE OF NEW YORK, Respondent.— Proceeding pursuant to article 78 of the Civil Practice Act to review a determination of the Board of Regents. Petitioner's license to practice medicine has been revoked by the Board of Regents; this proceeding reviews that determination. The problem is twofold; whether there is substantial evidence of a sufficient deviation from the standards of medical practice to warrant discipline; and, if there is, whether the revocation of license was excessive punishment. The essence of the charge against petitioner, which arose as a by-product of the investigation directed by the Appellate Division, Second Department, into irregularities in handling personal injury cases by lawyers, physicians and others, is that he prepared or authorized the preparation of fraudulent medical reports and bills for treatment of persons making personal injury claims. As to the general background of the problem, see *Matter of M. Anonymous* v. *Arkwright* (5 A D 2d 790, appeal denied 4 N Y 2d 676); *Matter of S. Anonymous* v. *Arkwright* (5 A D 2d 792), and *Matter of Anonymous No. 6* v. *Arkwright* (6 A D 2d 719, appeal dismissed 4 N Y 2d 1034, affd. 360 U. S. 287). A trial was had on the charges against petitioner before the Medical Grievance Committee. It was clearly demonstrated that in the cases of several false medical reports and medical bills submitted by I. Frank Miller, a lawyer, to insurance companies on petitioner's stationery, the signatures of the petitioner were forged. Except for those exhibits there is no direct proof in the record in the form of an exhibit of fraudulent or false reports or bills submitted by the petitioner. Some reports which concededly contained the signature of petitioner were received in evidence for the purpose of showing they were issued in connection with I. Frank Miller, the same lawyer about whom the charges against petitioner evolved, but these were not shown to have been false. Thus petitioner correctly argues in this court that " Not a single exhibit in evidence which was established to have been false had this petitioner's signature on it. Inversely, those exhibits which Dr. Shaw conceded bore his signature were not shown to have been false nor was any attempt made to prove falsity." Nevertheless, we are of opinion that there is substantial evidence in the record to sustain the

finding of professional misconduct. As to those reports and bills on which petitioner's signatures are shown to have been forged, there is proof that early in the controversy an investigator for the insurance company with which the reports and bills had been filed, visited petitioner and questioned him about these reports and bills which appeared on his letterheads and which purportedly bore his signature. It was established in this record that the petitioner had not treated these patients. The investigator testified that when he showed petitioner photostatic copies of these papers the petitioner said "that he recalled the individuals referred to, that they were correct, and that the signature was his." Concerning this testimony, petitioner at the hearing in the proceeding merely testified that "I don't even remember the names that he asked me about" and as to whether he had told the investigator what the latter had testified he had told him, petitioner said "I don't remember". Close personal relations were conceded by the petitioner with the lawyer Miller who had filed these reports and bills with the insurance company, including the inference established by petitioner that the lawyer had access to his office and stationery, and including the admission that on several occasions the lawyer prepared medical reports which the petitioner signed, even though in some respects he protested against medical inaccuracies and knew there were medical errors in the reports. There is additional proof which seems to us to have marked significance in this case, and which does not at all depend on the reports or bills on which petitioner's signature was forged. Arnold Enger testified that he had injured a finger in an accident in 1955; and that he was sent to see petitioner by the lawyer in 1957 "just before he went to the Arkwright Inquiry, just to see whether-what he looks like, if I had to be questioned about him." Enger testified he was never treated by petitioner; and petitioner testified he never treated Enger, and, indeed, that "I never saw him." His answer in this proceeding seems to imply that he authorized a report for Miller to the effect he had treated Enger. As to Enger he was asked: "Q. And any statement with respect to injuries concerning him, was prepared by somebody else on your stationery; is that it? A. Yes, Mr. Miller used to send me these stationeries, and I used to sign it like a fool, like a darn fool, without realizing; I had such faith in him." Nevertheless, in a sworn statement dated August 26, 1957 by the petitioner in connection with the Arkwright investigation he testified as follows: "Question: Doctor, have you actually brought with you the records that we have requested you to bring with you? Answer: I brought transcripts of those records. Question: What do you have with you, Doctor? Answer: I have Ronald Enger. I have Michael Melisi, Matilda Slutsky, Harold Calcagno and Ferdinand Scappioso (phonetic). Question: And were all those treated by you in connection with personal injures? Answer: Yes. Question: Will you now give the first date and last date of treatment and the amount of your bill. Answer: The amount of Ronald Enger — it was 22 visits with the X-rays, amounting to $142. Question: Do you have the first date of visit? Answer: The first day was 6-25-55." It is clear that his reference to "Ronald" Enger was intended for Arnold Enger. There is other proof which tends to support the finding which has been sustained by the Regents. We are of opinion there is substantial evidence on the record as a whole to form a basis for the decision reviewed. The petitioner has borne a good record in the community and in the medical profession. He is now 75 years old; had a hard and difficult struggle, both to obtain his education and to maintain himself in his profession; has had the respect and affection of his patients; and has not been very much actuated by financial considerations in his practice. Many aspects of the record are strongly appealing to human sympathy and charity. Yet we find ourselves unable to justify interference with the measure of discipline imposed

by the Regents in determining to revoke petitioner's license. This area of judgment and decision, affecting as it does the medical profession, is within the area of responsibility of the Regents and of special competence and judgment of the professional committees upon whom the Regents rely, and the facts shown by this record do not rise to a level where, if we were to differ with the Regents and its committees on the measure of discipline imposed, we would feel justified in setting up a different measure of discipline. We assume that the Regents themselves could entertain application for revision of their punishment if they were so advised. Determination unanimously confirmed, without costs.