**In the Matter of Clem McCLELLAND for the Writ of Habeas Corpus.**

**Civ. A. Nos. 65–H–291, 65–H–882.**

United States District Court
S. D. Texas,
Houston Division.

Oct. 6, 1966.

J. Edwin Smith and Jack J. Rawitscher, Houston, Tex., for petitioner.

J. Milton Richardson, Asst. Atty. Gen., Austin, Tex., Sam R. Wilson, Asst. Atty. Gen., and Carl E. F. Dally, Asst. Dist. Atty., Houston, Tex., for respondent.

## MEMORANDUM AND ORDER

CONNALLY, Chief Judge.

The petitioner has filed herein two applications for the writ of habeas corpus, Civil Action No. 65–H–291 and Civil Action No. 65–H–882, which have been consolidated. These attack two separate and distinct convictions, by different courts, at different times, for different offenses, based on different indictments, returned by different grand juries. Petitioner was convicted by the District Court of Travis County, Texas, of the offense of fraudulent conversion of an estate on April 22, 1964, the trial having been transferred on change of venue from Harris County. This is subject to attack in Civil Action No. 65–H–291. Petitioner was convicted of the offense of bribery on June 25, 1964, by the District Court of Falls County, Texas, on change of venue from Harris County. This conviction is attacked in Civil Action No. 65–H–882. Both convictions stem from the so-called Probate Court scandal of Harris County, Texas, which came to light in 1962.

Petitioner has been convicted of what to my mind is among the most serious of offenses. A long-time member of the Bar, and for many years Judge of the Probate Court of Harris County, Texas, he has been shown to have been a corrupt and dishonest judge, stealing from the estates of decedents being administered through his Court and accepting bribes from his friends and cronies whom he appointed to lucrative positions as appraisers, guardians, etc.

At the outset, it is well to note what is, and what is not, in issue. Petitioner makes no attack upon any matters which transpired during the two trials. His sole attack is directed at the indictment in each case. This is not the usual complaint that the indictment is inadequate, or does not apprise the defendant of the offense with which he is charged. It goes much deeper. While breaking his contentions down into some nine points, the real thrust is that his constitutional rights were infringed to such extent by reason of allegedly improper conduct of the District Attorney and one of the Justices of the Peace of Harris County in conducting a Court of Inquiry (which occurred before either indictment was returned), that the two grand juries could not thereafter under any circumstances return a valid indictment against him. In the event his point be sustained here, the argument would, I am sure, go further; and it would be contended that no grand jury could ever return a valid indictment against petitioner because of the Court of Inquiry proceedings.

The background is this. In the spring of 1962 it became common knowledge around the Harris County Courthouse that something was amiss in the official work of the Probate Court. It was known that some four or five intimates of the Probate Judge were receiving an inordinately large number of appointments; and that what appeared to be exorbitant fees were allowed. Both the District Attorney of Harris County and the reporters for the three daily newspapers of this city became aware of these rumors, and all were interested. The District Attorney exacted a promise from each of the three newspapers that they would not publish the story, at least until the official investigation was complete. One of the papers, however (the now defunct Houston Press), did not abide by this understanding, and published the story on June 5, 1962.

At this point the District Attorney was not aware to a certainty that any crime had been committed, or if so, who all the guilty parties might be—although certainly the petitioner as the Judge of the Court and the individuals who had received so many lucrative appointments were under grave suspicion.

In June of 1962, the District Attorney requested that the Honorable W. C. Ragan, a Justice of the Peace of Harris County, convene a Court of Inquiry pursuant to Article 886, Vernon's Ann. Texas Code of Criminal Procedure

(1925).[1] As contemplated by this statute, and in practice, the Court of Inquiry is purely a fact finding proceeding. It may issue subpoenas, take testimony, and do nothing else. There are no parties. There is no accused. No trial is conducted. The Justice of the Peace sitting in this capacity cannot determine any civil or criminal liability. If the facts developed indicate that a crime has been committed, the Justice of the Peace may issue an arrest warrant. That is the only order (other than subpoenas) which he may issue. Thus, the Court of Inquiry is completely unrelated to grand jury proceeding. As this is a local procedure conducted at the county level, I am advised by the Attorney General of Texas that there are no accurate figures or statistics with regard to the purposes or frequency with which it is used. However, in general, history shows that the Court of Inquiry procedure has been availed of in cases of wide public interest, as when the conduct of some public agency or official is called in question, and irrespective of the question of criminality. For example, a series of such inquiries was conducted in connection with the now famous Billie Sol Estes case. Evidence was developed there tending to show a colossal fraud not only on several sophisticated large business concerns, but on many hundreds of small farmers. Indictment and conviction in both state and federal courts resulted. An inquiry was held

recently in connection with alleged voting irregularities in Bexar County, Texas. No criminal charge resulted. As a further example, a Court of Inquiry was scheduled to inquire into all matters in connection with the assassination of President John F. Kennedy in Dallas, Texas, on November 22, 1963, though this was abandoned when the President of the United States by proclamation created The Warren Commission to make a similar inquiry on a nationwide scale. Inquiries are also held from time to time with regard to public issues or controversies, as evidenced by Inquiries into the indiscriminate sale of firearms, and the sale of obscene literature.[2]

The Court of Inquiry here in controversy convened in Houston, Texas, on June 14, 1962. Its purpose was "to inquire into the processing of various estates by the Probate Court" of Harris County.[3] A number of persons, including petitioner, were summoned as witnesses. Eight of these witnesses were represented by counsel, who entered appearances. Each of such persons, through his attorney, sought to assume the attitude of an accused. In fact, thereafter some were indicted, others were not.

The "ground rules" under which the Court of Inquiry was conducted (the real basis of petitioner's complaint) were as follows. Each witness was permitted to have his counsel present with him while

---

1. "When a justice of the peace has good cause to believe that an offense has been, or is about to be, committed against the laws of this State, he may summon and examine any witness in relation thereto. If it appears from the statement of any witness that an offense has been committed, the justice shall reduce said statements to writing and cause the same to be sworn to by each witness making the same; and, issue a warrant for the arrest of the offender, the same as if complaint had been made and filed."

2. A similar provision of the Texas Statute, Art. 9.02, V.A.T.S. Texas Election Code, provides for a Court of Inquiry in case of suspected irregularities in elections.

3. The scandal surrounding the Harris County Probate Court has made a substantial contribution to the business of Texas courts, state and federal, trial and appellate. For related cases, see: McClelland v. State, 373 S.W.2d 674 (Tex. Cr.App.1963); McClelland v. State, 389 S.W.2d 678 (Tex.Cr.App.1965); McClelland v. State, 390 S.W.2d 777 (Tex. Cr.App.1965); McClelland v. Briscoe, 359 S.W.2d 635 (Tex.Civ.App.1962) ref.n.r.e.; McClelland v. Briscoe, 359 S.W.2d 640 (Tex.Civ.App.1962) ref.n.r.e.; O'Brien v. State, 376 S.W.2d 833 (Tex.Cr.App. 1964); Martin v. State, 395 S.W.2d 631 (Tex.Cr.App.1965); Martin v. Texas, 382 U.S. 928, 86 S.Ct. 307, 15 L.Ed.2d 340 (1965); Martin v. Beto, 260 F.Supp. 589 (S.D.Tex. Aug. 22, 1966).

testifying. As the Justice of the Peace announced several times during the hearing, the proceeding was not adversary in nature, and neither counsel for the witness then testifying, nor counsel for the other witnesses was permitted to make objection to particular questions. However, each witness, on advice of counsel or otherwise, was permitted to decline to answer any question propounded to him simply by stating that he did not choose to answer. He was not required specifically to invoke his Fifth Amendment privilege. Each witness was excluded from the hearing room while not testifying. The attorneys for the witnesses were not permitted to cross-examine, or to call other witnesses. The petitioner, and several others toward whom the finger of suspicion pointed, were called. Many other witnesses were called. The petitioner's counsel was with him in the courtroom at all times. While required to take the stand, petitioner declined to answer a number of questions, and was not pressed to do so.

Because newspaper stories had already indicated the possibility of corruption in the Probate Court, the hearing was of wide public interest, and dominated the headlines for several days. The proceedings were broadcast by radio from the hearing room. Pictures were taken, including motion pictures, which later were broadcast by television on newscasts.

After hearing evidence for four days, the Court of Inquiry adjourned. It took no action, as it was empowered to take none.

A grand jury is always in session in Harris County, Texas, and one was in session on June 14, 1962. No evidence had been presented to this grand jury relating to any charges against petitioner prior to that date. Two members of the grand jury, on their own initiative, had attended one session of the Court of

Inquiry, one such grand juror for about 45 minutes and the other for approximately 20 minutes.

Sometime after the Court of Inquiry proceedings had been concluded, the district attorney presented evidence to the grand jury relating to the offense of embezzlement from the Estate of Gordon Robert Von Stroh.[4] As result, the indictment in Criminal No. 101,112 was returned. *None of the evidence adduced in the Court of Inquiry hearing was presented to the grand jury.* The offense with which petitioner was charged in Criminal No. 105,271 was not inquired into in the Court of Inquiry.

A new grand jury was impaneled February 1, 1963. An indictment for the offense of bribery was returned by this grand jury. Again, no evidence adduced at the Court of Inquiry hearing was offered.

As noted in the opening paragraphs hereof, because of wide publicity which the charges against petitioner and his associates had received, Criminal No. 101,112 was transferred to Austin, Travis County, Texas, for trial; and Criminal No. 105,271 was transferred to Marlin, Falls County, Texas, for trial. Conviction, appeal, and the exhaustion of state remedies followed in each case.

In discussing petitioner's contentions in detail, they may be categorized as follows: (a) his complaint that under the "ground rules" followed in the Court of Inquiry hearing he was denied the right to counsel, the right to confront his accusers, and the right to cross-examine witnesses against him or to offer witnesses in his own behalf or otherwise to defend himself; and (b) that because of the extensive publicity a grand jury could not thereafter constitutionally indict him.

(a) Upon analysis, the Court of Inquiry as used in Texas bears a striking resemblance to such federal bodies as the Civil Rights Commission, the Fed-

---

4. Many estates were involved. In fact, petitioner was tried and convicted of a third offense, which conviction was reversed by the Court of Criminal Appeals, 373 S.W.2d 674 (Tex.Cr.App.1963).

eral Trade Commission, and the Securities and Exchange Commission when these agencies are conducting investigations.

The Civil Rights Commission is empowered to "investigate allegations * * * that citizens of the United States are *unlawfully* being accorded or denied the right to vote, or to have their votes properly counted * * *." (Emphasis added.) 42 U.S.C. § 1975c. The commission has the duty to report its findings to the President and the Congress, along with recommendations. When the Civil Rights Commission is holding investigations, witnesses are entitled to have counsel present but no right exists to cross-examine other witnesses or offer rebuttal testimony. Nor do witnesses have the right to confront other witnesses who give damaging testimony against them. The procedure used by the Civil Rights Commission has been specifically upheld in Hanna v. Larche, 363 U.S. 420, 80 S.Ct. 1502, 4 L.Ed.2d 1307 (1960).[5]

The Federal Trade Commission, upon complaints by undisclosed parties, may investigate alleged violations of the anti-trust laws. See 15 U.S.C. § 46, and 16 C.F.R. § 1.11. The FTC gives witnesses only a general notice of the "purpose and scope of the investigation." A witness may have counsel present to advise him, but counsel may not participate in any way in the questioning. Cross-examination is not allowed. Nor does the FTC publish or disclose the name of a complaining party. See 16 C.F.R. § 1.12. Unlike the Civil Rights Commission, the FTC has the power to commence adjudicative proceedings against a party based upon the evidence gleaned from the investigation. 16 C.F.R. § 1.42.

The Securities and Exchange Commission is also authorized to conduct investigations. The language enabling the SEC to investigate alleged violations is quite similar to the Texas Court of Inquiry statute. Under the provisions of 15 U.S.C. § 80a–41(a), the SEC may " * * * make such investigations as it deems necessary to determine whether any person has violated or is about to violate any provision of * * * [the Act] or of any rule, regulation, or order hereunder, or to determine whether any action in any court or any proceeding before the Commission shall be instituted * * against a particular person or persons * * *."

As is the case with other investigating bodies, there is no right to confrontation or cross-examination in an SEC investigation. See 17 C.F.R. § 203. Certain similarities of procedure may also be found in comparing the Court of Inquiry with the investigating procedures followed by legislative committees. Congressional committees rarely extend to witnesses the right of detailed notice, confrontation, cross-examination, or the right to call other witnesses.[6] The fact that the investigation may show criminal conduct on the part of witnesses, or that information obtained in the investigation may be used in a subsequent criminal prosecution does not invalidate the proceedings.[7] See McGrain v. Daugherty, 273 U.S. 135, 179–180, 47 S.Ct. 319, 71 L.Ed. 580 (1927); Sinclair v. United States, 279 U.S. 263, 49 S.Ct. 268, 73 L.Ed. 692 (1929).

The language in In re Groban, 352 U.S. 330, 77 S.Ct. 510, 1 L.Ed.2d 376 (1957), is dispositive of petitioner's asserted denial of his right to counsel:

"Prosecution of an individual differs widely from administrative in-

---

5. It is interesting to note that the Rules of the Commission, Subdivision (k), provide for radio and television coverage of the investigation within the hearing room.

6. See Hanna v. Larche, 363 U.S. at p. 445, 80 S.Ct. at p. 1516, particularly footnote 24 and accompanying text.

7. It is common knowledge that officials of the Department of Justice follow closely congressional investigations for possible criminal prosecution, as witnessed by the investigation and prosecution of such persons as Billie Sol Estes, James R. Hoffa, and Bernard Goldfine.

vestigation of incidents damaging to the economy or dangerous to the public. The proceeding * * * was not a criminal trial, nor was it an administrative proceeding that would in any way adjudicate appellants' responsibilities for the fire. * * *

"The fact that appellants were under a legal duty to speak and that their testimony might provide a basis for criminal charges against them does not mean that they had a constitutional right to the assistance of their counsel. * * * When such charges are made in a criminal proceeding * * * [the defendant] then may demand the presence of his counsel * * *. Until then his protection is the privilege against self-incrimination." Id. at pps. 332–333, 77 S.Ct. at pps. 512–513.[8]

To the same effect, see Anonymous Nos. 6 and 7 v. Baker, 360 U.S. 287, 79 S.Ct. 1157, 3 L.Ed.2d 1234 (1959), where the Court upheld the denial of counsel to a witness testifying before an inquiry into the unethical practice of New York attorneys.

■ Holding as I do that the Court of Inquiry was investigatory in nature[9] and that it lacked the power to adjudicate the petitioner's criminal liability, the cases of Hanna v. Larche, supra, and In re Groban, supra, are controlling as to the alleged denial of petitioner's constitutional rights before the Court of Inquiry. These cases show that under the circumstances the petitioner was not denied any right guaranteed him by the Constitution.

■ (b) I turn now to petitioner's contention that the massive publicity surrounding the Court of Inquiry and the evidence elicited in some way deprived him of the right to be indicted by an unbiased grand jury. Where such a contention is made, the burden is upon petitioner to prove that such bias in fact was present. In Beck v. Washington, 369 U.S. 541, 82 S.Ct. 955, 8 L.Ed.2d 98 (1962), in the concluding paragraph Mr. Justice Clark, speaking for the Court, quotes as follows:

"'While this Court stands ready to correct violations of constitutional rights, it also holds that "it is not asking too much that the burden of showing essential unfairness be sustained by him who claims such injustice and seeks to have the result set aside, and that it be sustained not as a matter of speculation but as a demonstrable reality."' United States ex rel. Darcy v. Handy, 351 U.S. 454, 462, 76 S.Ct. 965, 970, 100 L.Ed. 1331 (1956)."

■ There is no proof that any member of the grand jury of May, 1962, was biased or prejudiced against petitioner. There is no evidence even tending in this direction, unless it be that two members of the grand jury attended the Court of Inquiry briefly. This fact, I suggest, in itself shows only interest by these grand jurors, not bias. Thus petitioner must rely upon the proposition that because of publicity the grand jury must of necessity have become biased, and rendered incapable of returning a valid indictment. The answer to this

---

8. It should be noted that the Fire Marshal in *Groban* had the duty (as did the Justice of the Peace in the instant case) to direct the arrest of the person shown responsible for the crime if the investigation revealed criminal conduct. The fact that the investigational body may direct an arrest does not seem to affect its otherwise investigative nature. The Court in *Groban* does not attach any significance to this power, nor do I. It would require a great stretch of the imagination to argue that a mere arrest constituted an adjudication of a person's civil or criminal liability.

9. I do not find any merit to petitioner's somewhat oblique contention that the Court of Inquiry was directed expressly at him. There is no evidence before me to this effect. Indeed, the District Attorney of Harris County, at whose request the Court of Inquiry was held, expressly denied that the Inquiry was a "one man" inquiry. The record reveals that a sweeping investigation of the probate court was held, which resulted in not one but several defendants being ultimately indicted. Cf. Anonymous Nos. 6 and 7 v. Baker, 360 U.S. 287 (1959) at pps. 296–298, 79 S.Ct. 1157.

argument is well put in United States v. Hoffa, 205 F.Supp. 710 (S.D.Fla. 1962), where the Court, in ruling on the same point, said:

"To accept the contention urged by the defendants as a rule of law certainly would produce absurd results since no one who is prominent and well known could be charged with the commission of any crime because the charge against such a person no doubt would cause very large and widespread adverse publicity, precluding an indictment." (At page 717.)

The petitioner makes no direct attack on any member of the grand jury of February, 1963. Apparently he relies on the presumed bias caused by the publicity of some eight months before. Again, this is unavailing. Beck v. Washington, supra; Estes v. United States, 335 F.2d 609 (5th Cir. 1964).

 There likewise is no merit in the claim that testimony of the witnesses before the Court of Inquiry may have been read by the grand jurors, and consciously or unconsciously, considered by them. While there is no proof that such was the case, if it were, this would constitute no constitutional invalidity. A grand jury may consider hearsay evidence, or the grand jurors may rely upon information within their personal knowledge. United States v. Blue, 384 U.S. 251, 86 S.Ct. 1416, 16 L.Ed.2d 510 (1966); Lawn v. United States, 355 U.S. 339, 78 S.Ct. 311, 2 L.Ed.2d 321 (1958); Costello v. United States, 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397 (1956); Holt v. United States, 218 U.S. 245, 31 S.Ct. 2, 54 L.Ed. 1021 (1910).

I have carefully reviewed the evidence adduced at the hearing and also the transcriptions of all of the state proceedings of which petitioner makes complaint, particularly the record of the Court of Inquiry and the record on the Motion to Quash the Indictment, and I am convinced that no constitutional infirmity exists in petitioner's convictions.

Therefore, for the reasons stated herein, it is ordered, adjudged and decreed that petitioner's application for the writ of habeas corpus be and is denied.