Edward NASON, Petitioner,

v.

IMMIGRATION AND NATURALIZATION SERVICE, Respondent.

No. 180, Docket 30623.

United States Court of Appeals Second Circuit.

Argued Nov. 16, 1966.
Decided Jan. 10, 1967.

10. See footnote 9.

Rita E. Hauser, New York City, for petitioner.

Francis J. Lyons, Sp. Asst. U. S. Atty., New York City (James G. Greilsheimer, Sp. Asst. U. S. Atty., and Robert M. Morgenthau, U. S. Atty., for Southern Dist. of New York, New York City, on the brief), for respondent.

Before LUMBARD, Chief Judge, and MEDINA and KAUFMAN, Circuit Judges.

MEDINA, Circuit Judge:

Petitioner Edward Nason seeks review of a finding by the Immigration and Naturalization Service that he is deportable under 8 U.S.C. Section 1251(a) (4) for having been convicted of two crimes involving moral turpitude not arising out of a single scheme of criminal conduct.

The petitioner is a native and citizen of Canada, who was last admitted

to the United States for permanent residence on April 29, 1961. On April 9, 1965, he pleaded guilty to three counts of an information in the United States District Court for the Southern District of New York for unlawfully, wilfully and knowingly devising a scheme to defraud by use of the mails during the period from November 1, 1962 through December 31, 1962, in violation of 18 U.S.C. Section 1341. On the same day he also pleaded guilty to three additional counts of the same information, for devising a similar scheme, in violation of the same section, during the period from October 2, 1963 through October 24, 1963. The frauds charged in the three counts covering the period from November 1, 1962 through December 31, 1962 were effected by renting a Post Office Box using the fictitious name "Charles C. Cole" and ordering various items of merchandise that were delivered to the Post Office Box and "paid" for by worthless checks signed "Charles C. Cole." A similar scheme was charged in the three other counts covering the period from October 2, 1963 through October 24, 1963, by the use of the fictitious name "Peter Hughes." Upon his plea of guilty on these six counts petitioner was given a suspended sentence and placed on probation for two years. Each of these crimes involves fraud and hence moral turpitude within the meaning of 8 U.S.C. Section 1251(a) (4).

On June 15, 1965, more than two months after his conviction, petitioner appeared at the Immigration and Naturalization Service office voluntarily and was questioned by an investigator of the Service. Prior to the commencement of the questioning the investigator advised the petitioner:

"I desire to take a statement from you concerning a matter of interest to this Service. You are advised that such a statement should be entirely voluntary and that whatever you say may be used against you or any other person in any Service proceedings."

The investigator then asked petitioner, "Do you understand and are you willing to make that statement at this time?", and petitioner responded, "Yes, sir."

When he appeared before the investigator, petitioner was not accompanied by a lawyer, he did not request an opportunity to consult a lawyer, nor was he advised that a lawyer could be present. He was under no restraint of any kind and was free to terminate the interrogation at any time and leave.

On July 9, 1965 deportation proceedings were instituted and on August 6, 1965 a hearing was had before a special inquiry officer, as provided in 8 U.S.C. Section 1252(b). He was then represented by counsel. Petitioner was adjudged deportable and, on June 2, 1966, the Board of Immigration Appeals dismissed his appeal.

On this challenge to the validity of the deportation order petitioner claims: (1) that he was entitled to have a lawyer present at the interrogation by the investigator that he should have been advised of his right to have a lawyer present and that it was error to receive in evidence at the hearing before the special inquiry officer a copy of the transcript of his answers to the questions put to him by the investigator because of the failure to advise him of his right to have a lawyer present; and (2) that the Board of Immigration Appeals had adopted an improper and prejudicial method of appraising the evidence on the record as a whole.

We think petitioner was not entitled to have a lawyer present at the preliminary interrogation and that it was not error to fail to advise him that he had a right to counsel or to receive in evidence at the hearing his sworn statement made at the preliminary interrogation. However, we agree with petitioner's contention that the method of appraising the evidence by the Board of Immigration Appeals failed to measure up to the standards required in deportation proceedings and for that reason remand the case.

## I

Although the consequences of deportation are in many instances of very serious moment to the deportee, a deportation proceeding has uniformly been held to be civil and not criminal in character. Fong Yue Ting v. United States, 149 U.S. 698, 13 S.Ct. 1016, 37 L.Ed. 905 (1893); Bugajewitz v. Adams, 228 U.S. 585, 33 S.Ct. 607, 57 L.Ed. 978 (1913); U. S. ex rel. Bilokumsky v. Tod, 263 U.S. 149, 44 S.Ct. 54, 68 L.Ed. 221 (1923); Harisiades v. Shaughnessy, 342 U.S. 580, 72 S.Ct. 512, 96 L.Ed. 586 (1952); Woodby v. Immigration and Naturalization Service, 385 U.S. 276, 87 S.Ct. 483, 17 L.Ed. 2d 362, decided December 12, 1966. It is, moreover, within the competency of the Congress to prescribe rules and regulations affecting the fairness of a trial of disputed issues of fact, such as the burden of proof, the admissibility of evidence and the right of the deportee to counsel. In the absence of congressional action such questions have been traditionally "left to the judiciary to resolve * * in the interest of the evenhanded administration of the Immigration and Nationality Act." Woodby v. Immigration and Naturalization Service, supra.

The statutory pattern governing this case seems to us to be clear. Thus 8 U.S.C. Section 1252(b) (2) provides, with respect to the hearing before the special inquiry officer: "[T]he alien shall have the privilege of being represented (at no expense to the Government) by such counsel, authorized to practice in such proceedings, as he shall choose."

This provision, however, has no application to proceedings conducted in pursuance of the broad investigatory powers of immigration officers. The statute provides that "any immigration officer" has the

> power to administer oaths and to take and consider evidence of or from any person touching the privilege of any

alien * * * to enter, reenter, pass through, or reside in the United States or concerning any matter which is material and relevant to the enforcement of this chapter and the administration of the Service * * *. 8 U.S.C. Section 1225(a).

See also 8 U.S.C. Section 1357(a) (1).

Although the statute distinguishes between hearings before the special inquiry officer, where counsel is permitted, and investigatory hearings, no distinction is drawn among various types of investigations or between witnesses generally and witnesses who may subsequently become the object of Immigration and Naturalization Service action. As there is no provision for the attendance of counsel during the investigations of the Service, it follows, we think, that petitioner has no statutory right to counsel at the preliminary hearing.

The reason for allowing counsel at the hearing and not allowing counsel at the preliminary interrogation is not far to seek. At the investigatory stage, especially in matters affecting immigration involving relationships with foreign countries, the alien himself may be the principal source of information for the implementation of the Act. There are many other equally cogent reasons of general application. The trial before the special inquiry officer is a different story.

Even if the principles of Miranda v. State of Arizona,[1] 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) and Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964) were applicable, and we think they are not applicable, still this would be of no help to this petitioner as he was not in custody or under any other compulsion or restraint when he answered the questions put to him by the investigator.

The sum and substance of the matter is that petitioner made a purely

---

[1]. In the case before us the hearing was completed on August 6, 1965 and the order under review was entered on June 2, 1966, eleven days prior to June 13, 1966, the date of the decision in *Miranda*. See Johnson, et al. v. State of New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966).

voluntary statement and this statement was properly received in evidence by the special inquiry officer pursuant to 8 CFR 242.14(c).[2] The fact that petitioner was not represented by counsel at the taking of the statement does not affect its admissibility. United States ex rel. Beck v. Neelly, 202 F.2d 221 (7 Cir. 1953), cert. denied 345 U.S. 997, 73 S.Ct. 1139, 97 L.Ed. 1403; United States ex rel. Bilokumsky v. Tod, 263 U.S. 149, 44 S.Ct. 54, 68 L.Ed. 221 (1923); Landon v. Clarke, 239 F.2d 631 (1 Cir. 1957). Compare: In Re Groban, 352 U.S. 330, 77 S.Ct. 510, 1 L.Ed.2d 376 (1957); Anonymous Nos. 6 and 7 v. Baker, 360 U.S. 287, 79 S.Ct. 1157, 3 L.Ed.2d 1234 (1959); Ben Huie v. Immigration and Naturalization Service, 349 F.2d 1014 (9 Cir. 1965). See also Ah Chiu Pang v. Immigration and Naturalization Service, 3 Cir., 368 F.2d 637, decided October 28, 1966 (per curiam).

## II

■ We have no doubt that, subject to the issue of credibility and any questions of law relating to the interpretation of 8 U.S.C. Section 1251(a) (4), petitioner was competent to give relevant testimony on the subject of whether these several plans to defraud arose or did not arise out of a single scheme of criminal misconduct. In Costello v. Immigration and Naturalization Service, 311 F.2d 343 (2 Cir. 1962), reversed on other grounds, 376 U.S. 120, 84 S.Ct. 580, 11 L.Ed.2d 559 (1964), we concluded that in the absence of any admissible and relevant evidence other than the records of conviction (Costello did not testify), the special inquiry officer was required to find that the petitioner had been convicted of two crimes not arising from a single scheme of misconduct.

In the present case, by contrast, there was evidence, other than the record of convictions, which was relevant to the issue of how many criminal schemes existed. The procedural difficulty here arises from the fact that petitioner in his answers to the investigator made a number of admissions strongly corroborative of the inferences naturally to be drawn from the matter appearing on the face of the record of the convictions. With nothing else before it the special inquiry officer and the Board of Immigration Appeals could readily have made a finding, such as it could have made had the records of the convictions been the only evidence before them, to the effect that these separate crimes did not arise "out of a single scheme of criminal misconduct." And this we think would be true whether the burden of persuasion resting on the Government was to prove its allegations "by reasonable, substantial, and probative evidence" or "by clear, unequivocal, and convincing evidence," as recently held by the Supreme Court in Woodby v. Immigration and Naturalization Service, 385 U.S. 276, 87 S.Ct. 483, 17 L.Ed.2d 362, decided December 12, 1966. But here, at the hearing before the special inquiry officer, petitioner more or less repudiated what he had said in his statement to the investigator, and gave testimony to the contrary. This made it necessary for the Board of Appeals to decide the issues on the record as a whole, and this is precisely what the Board did not do. Instead it ruled as follows:

"However, the respondent has repudiated this statement of June 15, 1965 in which he stated there was no single scheme whereas in his testimony at the hearing he reverses himself under leading questioning of counsel and asserted there did exist a single scheme. The situation then boils down to one where the testimony and the statement cancel each other out and we are left to the record of conviction."

■ We cannot say that this is a satisfactory application of the rule requiring the Government to establish its case in a deportation proceeding such as

2. *"Use of Prior Statements.* The Special Inquiry Officer may receive in evidence any oral or written statement which is material and relevant to any issue in the case previously made by the respondent or any other person during any investigation, examination, hearing or trial."

this "by clear, unequivocal, and convincing evidence."

We have carefully refrained from making any appraisal of the proofs in this record or giving any indication of the extent to which the petitioner may be entitled to testify with respect to his mental operations. These are matters of law and fact that must be left in the first instance to the special inquiry officer and to the Board of Appeals.

Reversed and remanded for further proceedings in accordance with this opinion.

LUMBARD, Chief Judge (dissenting) :

I dissent and vote to affirm the order of deportation. The evidence is so "clear, unequivocal and convincing" in this case, that I see no useful purpose in remanding. The majority readily admits, and I do not see how one could deny, that the record of the convictions coupled with Nason's admissions at the preliminary hearing was sufficient to warrant a finding that the two crimes did not arise "out of a single scheme of criminal misconduct" by any standard. But because the witness later reversed himself "under leading questioning of [his] counsel and asserted there did exist a single scheme," my brothers remand.

It seems clear to me that the Board of Appeals did decide the issues on the evidence from the record as a whole, and that it decided that, at very best, Nason's testimony was inconsistent and patently unreliable. The Board chose not to rely on Nason's damaging admissions, upon which it might have placed considerable weight. Its view was simply that the record of the two separate and distinct mail frauds, committed over ten months apart, was sufficient evidence upon which to base its finding. I agree.

Here no testimony could support the claim that these two felonies, so removed in time, and void of any conceivable continuity, compare e. g., Barrese v. Ryan, 203 F.Supp. 880, 883 (D.Conn. 1962), could have arisen out of a "single scheme" as Congress intended that phrase.

The evidence was clear, unequivocal and convincing as a matter of law. It serves no purpose for us to remand so that the Board can do again, by merely repeating the formula set forth in the Court's opinion, what it has already done and what it must obviously do again.

ST. PAUL FIRE & MARINE INSURANCE COMPANY, Appellant,

v.

UNITED STATES of America et al., Appellees.

No. 22266.

United States Court of Appeals
Fifth Circuit.

Jan. 5, 1967.

Harold L. Ward, Miami, Fla., Fowler, White, Gillen, Humkey & Trenam, of counsel, Miami, Fla., for appellant.

Starr W. Horton, Alfred E. Sapp, Asst. U. S. Atty., Miami, Fla., Stephen R. Booher, Fort Lauderdale, Fla., Mallory H. Horton, Miami, Fla., William A. Meadows, Jr., U. S. Atty., S. D. Florida, for appellee.

Dale & Stevens, Fort Lauderdale, Fla., of counsel, for appellee Rose Cement Supply, Inc.

Before TUTTLE, Chief Judge, WISDOM, Circuit Judge, and FISHER, District Judge.

FISHER, District Judge:

This is an appeal from a judgment in favor of the United States against St. Paul Fire & Marine Insurance Company, which judgment denied recovery by St. Paul Fire & Marine Insurance Company against either of the third-party defendants, Stephen Messana and Rose Cement Supplies, Inc.

Rose Cement Supply, a partnership composed of Arthur J. Rose and Stephen Messana, employed Pedro Zugasti as a customs broker to import cement which was sold by the partnership to its customers.

Pedro Zugasti was principal and St. Paul Fire & Marine Insurance Company was surety on a bond required by the United States guaranteeing payment of duty imposed on the imported cement.

Nine consumption entries were filed by Zugasti with the government reflecting importation of cement by the partnership Rose Cement Supply. The government liquidated the consumption entries in 1962 and in respect thereof assessed additional import duties of $8,556.07, for which it brought suit in 1963 against both Zugasti and St. Paul.

Zugasti, although a party defendant, was never served with process. St. Paul with leave of the court, joined as third-party defendants Messana and the corporation, Rose Cement Supplies, Inc., which concern in 1961 purchased the assets and business of the partnership, Rose Cement Supply. Neither Rose nor Messana were share holders or officers of the corporation. The partner, Arthur Rose, died in 1962.

The third-party action brought by St. Paul against Messana and the corpora-

tion was based on the subrogation theory that if the government recovered against St. Paul then St. Paul in turn could recover from Messana the surviving partner of Rose Cement Supply and/or the corporation, Rose Cement Supplies, Inc.

St. Paul alleges four assignments of error:

1. The court erred in ruling that a surety is not subrogated to any rights of the principal connected with the claim sued upon.

2. The court erred in ruling that the government had no claim against the partnership to which St. Paul would be subrogated.

3. The court erred in finding from the evidence that all notices required by law to be mailed to Zugasti were in fact duly and properly mailed.

4. The court erred in finding from the evidence that Zugasti, St. Paul's principal, executed the consumption entries in question.

■ Finding no merit in assignments of error three and four, we affirm. The trial court adequately disposed of the contentions of the appellant in holding,

"Under the terms of said bond, St. Paul unequivocally bound itself to the United States to pay the full amount of duties and taxes found to be due on each of said consumption entries. St. Paul's affirmative defenses in regard to the necessary statutory notice requirements were clearly disproved by the evidence. The evidence reveals and the court finds that the merchandise was appraised and Zugasti was given written notice thereof by mail on Customs Form 4301. (Plaintiff's Exhibits Nos. 1A through 1I); that on July 10, 1962, the entries were liquidated in the total amount of $8,-556.07 due, and Bulletin Notice of Entries Liquidated, Customs Form 4333, was posted in a conspicuous place in the Customs House at Port Everglades by the Deputy Collector of Customs. (Plaintiff's Exhibits Nos. 1A through 1I and 2); that on July 10, 1962, Zu-

gasti was notified by mail on Customs Form 5107, Notice of Duty and Internal Revenue Tax Due, that said total amount of $8,556.07 was due on said entries. (Plaintiff's Exhibit No. 4); that on August 10, 1962, Zugasti and St. Paul were notified that said amount of $8,556.07 was due and unpaid and formal demand was made upon St. Paul for payment of said $8,-556.07, by registered mail on Customs Form 4619, Final Notice of Moneys Due. (Plaintiff's Exhibit No. 5); that no written protest was filed with the Office of the Collector of Customs, nor was the amount due paid.

"The Court concludes that pursuant to the terms of said bond, St. Paul is liable to the United States for the full amount due upon said entries, in the total amount of $8,556.07, plus interest at the rate of 6 percent per annum from July 10, 1962."

■■ We next consider the contention of the appellant that the trial court erred in not permitting St. Paul a recovery against third-party defendants. The question presented is whether or not St. Paul is subrogated to the rights and remedies of the government [creditor] on the one hand and also the principal Zugasti [debtor] on the other hand as against third-party defendant Stephen Messana, surviving partner of the partnership of Rose Supply and/or Rose Cement Supplies, Inc. We answer the question in the affirmative.

Maryland Casualty Co. v. United States, 1940, 32 F.Supp. 746, 754, 91 Ct.Cl. 203, holds:

"The right of subrogation extends not only to the rights and remedies of the creditor but also to those of the principal on the bond."

Considering first whether St. Paul may be subrogated to the rights of the principal Zugasti and thus be permitted to recover against the third-party defendant Messana; the trial court denied St. Paul this right on the theory that Zugasti was a customs broker rather than an agent and employee of the partnership, Rose Supply Company, and for

that reason held that St. Paul could not go beyond Zugasti.[1]

The evidence discloses that Zugasti was an employee of the partnership and was also acting in behalf of the partnership as a customs broker. It would appear that all equitable principles would dictate that Zugasti should be given the opportunity to make himself whole, since the partnership received the financial benefits from the sale of cement to its domestic market. Pearlman v. Reliance Ins. Company, (1962) 371 U.S. 132, 83 S.Ct. 232, 9 L.Ed.2d 190; Compania Anonima Venezolana de Navegacion v. A. J. Perez Export Co., (C.A. 5th 1962) 303 F.2d 692, cert. den. 371 U.S. 942, 83 S.Ct. 321, 9 L.Ed.2d 276.

For St. Paul to bear the cost and expense of these import duties without being able to recoup from the partnership by being subrogated to the rights of Zugasti is unjust enrichment in every sense of the word, and the fact that St. Paul may or may not have dealt with Zugasti as a principal is totally irrelevant to the issue of whether St. Paul as surety is subrogated to the rights of Zugasti (debtor).

American Surety Co. v. Morton, (D.C., Ed.Ill., 1958) 22 F.R.D. 261, states at page 263,

"It is axiomatic that a surety is subrogated and succeeds to the right owned by the party whose obligation the surety becomes liable to pay."

We therefore hold that St. Paul being subrogated to the rights of Zugasti has a cause of action against the surviving partner Messana.

The trial court further held that St. Paul could not recover from the third-party defendants by being subrogated to the rights of the government [creditor], under the theory that the nominal consignee [Zugasti] was considered the owner and by statute 19 U.S.C. § 1483,[2] was the principal obligor under the bond; therefore, the surety discharging the debt of its principal to the government, would then become subrogated to the rights of the government against the partnership; and the government having no rights against the partnership, there are no rights to which St. Paul can be subrogated.[3] As authority for this position, the trial court cites the case of R. J. Saunders & Co. v. Vincent, 309 F.2d 65 (2nd Cir. 1962). The Saunders case was

1. "St. Paul took the position at the trial of this cause, and reasserts it now, that Zugasti was an agent for Rose Cement Supply. Then and now St. Paul claims that if Zugasti had paid the import taxes due the United States, he would have acquired a right to be reimbursed by his principal, Rose Cement Supply; and that when St. Paul pays Zugasti's obligation to the government, it should be subrogated to Zugasti's claim for reimbursement against his principal, Rose Cement Supply, and ultimately against Messana and Rose Cement Supplies, Inc. "Messana was a silent partner in the partnership of Rose Cement Supply, and Rose Cement Supplies, Inc., and is the corporate successor to said partnership. "To allow St. Paul a recovery on this theory would require a holding that St. Paul is entitled to be subrogated to the position of Zugasti whose performance it assured, and also to the position of the government, whose claim St. Paul is obligated to pay. "The doctrine of subrogation does not permit a surety to move into the shoes of the debtor, whose performance was assured; but rather it restricts the surety to the position of the creditor, whose claim has been paid by the surety. See, American Fidelity Co. v. Delaney, 114 F. Supp. 702, 711 (D.C.Vt.1953); 50 Am. Jur. Subrogation §§ 3 and 110 (1944). "Therefore, St. Paul as surety for Zugasti can be subrogated only to the government's rights against Rose Cement Supply. The government has no rights against Rose Cement Supply. See, R. J. Saunders & Co. v. Vincent, 309 F.2d 65 (2nd Cir. 1962). Hence there are no rights in the government to which St. Paul can be subrogated.